ROBERTS, J.,
for the Court.
¶ 1. A jury seated in the Circuit Court of Jackson County returned a guilty verdict against John Johnson for the depraved-heart murder of Keith Franklin on March 5, 2008. Johnson was sentenced to life in the custody of the Mississippi Department of Corrections (MDOC). Aggrieved, Johnson appeals and raises three issues. It appears that Johnson’s intent is to attack the legal sufficiency as well as the weight of the evidence. Therefore, we have slightly reordered and combined the issues. They are: (1) whether there was insufficient evidence to support a verdict of depraved-heart murder, and whether the verdict is against the overwhelming *387 weight of the evidence, which Johnson contends established that he shot Franklin in the heat of passion and is, at most, guilty of manslaughter; and (2) whether the State failed to prove that he did not act in necessary self-defense, and whether the verdict is against the overwhelming weight of the evidence, which Johnson contends established that he shot Franklin in necessary self-defense. After a thorough review of the record and careful consideration of the issues, we find that the evidence was legally insufficient to support the jury’s guilty verdict of depraved-heart murder, and that the verdict is against the overwhelming weight of the evidence. We find that to allow it to stand would sanction an unconscionable injustice. Therefore, we reverse judgment of the conviction of depraved-heart murder and remand this case to the circuit court under the “direct-remand rule” for re-sentencing for manslaughter in accordance with this opinion.
FACTS AND PROCEDURAL HISTORY
¶ 2. On May 7, 2004, Johnson was indicted by a Jackson County grand jury on the charge of the deliberate-design murder of Franklin on November 21, 2003. The date of the killing was later amended by the court on the State’s motion to November 19, 2003. After numerous continuances by both the State and the defense, the case was actually tried some four-and-a half years later on May 3, 2008. At trial, four eyewitnesses, including Johnson, to the shooting testified: Linda Mizell, Starla Johnson (Starla), Rodney Welford, and Johnson. In its case-in-chief, the prosecution called only one eyewitness, Mizell, to make its case. The remaining eyewitnesses were all presented by defense counsel.
¶ 3. Reportedly, Johnson and Franklin were friends until Franklin began dating Johnson’s daughter, Starla; Franklin was fourteen years Starla’s senior. After Franklin began dating Starla, she quit school and lost her job. It is unclear from the record exactly how long Starla and Franklin dated before their relationship resulted in tragedy, but on November 19, 2003, the date of Franklin’s death, Franklin was thirty-four, and Starla was twenty.
¶ 4. Johnson presented undisputed testimony that nearly three months before the shooting in the instant case, Franklin and Johnson were involved in a violent altercation at Johnson’s home. It is not completely clear what triggered the argument between them, but the dispute culminated with Franklin wielding a baseball bat at Johnson; Johnson shooting Franklin; and Franklin then taking a gun from his car and shooting multiple times into Johnson’s house.[1] According to the testimony, Franklin had donned a bullet-proof vest before his “visit” to Johnson’s house that day, so he escaped unharmed. Apparently, no one was hurt by the multiple gunshots into Johnson’s home. Despite the turbulent relationship between Franklin and Starla’s family, the two continued dating. They were living together when Franklin was killed.
¶ 5. Around seven or eight o’clock p.m., after dark on the evening at issue, Johnson, accompanied by Welford, attempted to meet Starla at a restaurant in order to retrieve his cell phone. However, when he arrived at the restaurant Starla had already left. Thinking he might find Starla at Mizell’s home, Johnson went there. Mi- *388 zell testified that she had become acquainted with both Starla and her father, Johnson, at separate times through mutual friends. Mizell testified that Johnson drove slowly in front of her house and stopped in the road alongside her driveway. Starla was at Mizell’s home, and testimony established that Starla and Johnson began to argue about her relationship with Franklin, as well as about the cell phone. Franklin was not present when Johnson arrived at Mizell’s home because he and a companion, Claude Williams, had gone to a nearby convenience store to purchase beer, and testimony established that Johnson told Starla that he did not want to see Franklin that day. However, because Franklin was the one in possession of Johnson’s cell phone, Starla called him and instructed him to return to Mizell’s home, so he could return the phone to Johnson.
¶ 6. While Johnson and Starla were still arguing, Franklin and Williams returned from the store. Undisputed testimony established that Franklin exited his vehicle with a beer bottle in hand and approached Johnson’s vehicle where the two began to argue over Franklin’s relationship with Starla. Johnson, Starla, and Welford testified that Franklin became physically aggressive toward Johnson. Johnson and Welford claimed that they heard glass break on the side of the truck. Johnson claimed he thought Franklin had broken the beer bottle and was going to cut him with it. However, Mizell testified that “no hits or anything was ever laid ... on each other.” Although Mizell testified that she could see clearly from her yard, she acknowledged that she would have been the one furthest away from Johnson and Franklin.
¶ 7. It is undisputed that Johnson never left the driver’s seat of his vehicle while stopped in front of Mizell’s home, and Johnson testified that he never took off his seat belt. Also, Johnson, Mizell, Starla, and Welford stated to the police that when Johnson began to drive forward slowly attempting to leave, Franklin began to run alongside Johnson’s vehicle. Johnson gave the following account about what occurred immediately before the shooting.
¶ 8. Johnson testified that “[he] heard glass break, ... [he] turned to look, and [Franklin] [came] through the window on [him], and [Johnson] grabbed [his] pistol. [He] thought [he] shot [Franklin] in the shoulder.” After shooting Franklin, Johnson immediately left the scene. Despite Johnson’s stated belief that Franklin had broken the beer bottle, no broken beer bottle or shards of glass from a broken beer bottle were found at the scene.[2] However, there were two intact beer bottles found near Franklin’s body after the shooting, and one was determined to be the bottle that Franklin was holding at the time of the shooting. The paramedics’ life-saving measures failed, and Franklin was pronounced dead at the scene.
¶ 9. Although Mizell’s account of the events differed somewhat from Johnson’s, Starla’s, and Welford’s, it was not in total contradiction. She testified that when Johnson pulled up in front of her home, Starla went out to talk to Johnson, and Starla and Johnson began to argue. She further testified that Franklin pulled up shortly thereafter, and just as Johnson, Starla, and Welford had testified, the driver’s side door of Johnson’s truck was open for some period of time while the three were arguing. Mizell testified that her *389 five-year-old daughter was outside the gate with Starla when Franklin pulled up. She stated that she heard yelling, so she called for her young daughter to come inside the house. After situating her daughter safely inside the home, Mizell returned to the front yard and told the others “to take [the argument] somewhere else.” Despite her admitted period of absence from the front yard, Mizell testified that Franklin never hit Johnson. She stated that after telling them to leave, Johnson began to “roll off,” or move forward slowly, and Franklin reached for his beer bottle on the back of the truck. Mi-zell stated that it was then that Johnson shot Franklin under Franklin’s left arm. She further testified that after the shot was fired, Franklin fell backwards, and Johnson drove away.
¶ 10. Dr. Paul McGarry, a forensic pathologist, testified that the bullet was shot at an extremely close range, and it entered Franklin’s body at his upper chest below his left shoulder. Dr. McGarry testified that the bullet moved downward fifty degrees and then backward twenty degrees before exiting the back of Franklin’s body. He testified that the wound was consistent with Franklin facing the truck with his left shoulder more toward the truck than his chest. Dr. McGarry also testified that the wound was consistent with Johnson’s account of Franklin reaching into the vehicle, possibly trying to unlock the door or reach the door handle. However, upon redirect questioning by the State, he stated that the entry of the bullet could have been the same under any circumstance wherein Franklin was facing the truck with his left side more toward the truck than the center of his body. Dr. McGarry further testified that the stippling of the skin around the entry wound and gun powder particles on Franklin’s clothing and skin indicated that the end of the gun was only inches away from Franklin when it was fired. The autopsy report also indicated that Franklin had “contusions and abrasions [on his] hands and left forearm.” Dr. McGarry did not opine about the cause of the abrasions. The State, in its closing argument, contended that the abrasions likely occurred when Franklin fell to the ground. Johnson contended that the abrasions were likely caused by Franklin punching or attacking him right before Johnson shot Franklin.[3]
¶ 11. After the shooting, Johnson immediately left and drove to the home of his friend, Steve Holcolm, and he asked Hol-colm if he could leave his truck at Hol-colm’s residence. Holcolm testified that early the next morning Johnson’s truck was gone, but he found a nine-millimeter gun on the hood of his truck. Both Johnson and Holcolm testified that Holcolm’s son threw the gun away. Officer Tony Hollifield, a narcotics agent for the Jackson County Sheriffs Department, recovered the nine-millimeter gun from a nearby “garbage hull” wrapped in some sort of tarpaulin or feed bag. Upon his arrest, Johnson told Officer Hollified that “he didn’t kill anybody; ... it was self-defense.” Johnson maintained that assertion at trial.
¶ 12. At the jury instruction conference with the judge, the prosecutor submitted, for the first time, a jury instruction, S-2, on murder that contained theories of both deliberate-design murder and depraved-heart murder. Defense counsel objected because the grand jury had indicted Johnson only for deliberate-design murder. The trial judge denied the objection and *390 commented that the supreme court had previously stated that the two charges are almost synonymous. The State requested, and the court granted, jury instructions S-7, S-8, and S-9, all of which had to do with the lesser-included offense of manslaughter. After a three-day trial, the jury returned a verdict of guilty of depraved-heart murder, and Johnson was sentenced to life in the custody of the MDOC. Johnson made timely motions for a judgment notwithstanding the verdict (JNOV) or, in the alternative, for a new trial, but the circuit court denied these motions on May 23, 2008. We now address each issue.
ANALYSIS
I. WHETHER THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUPPORT A VERDICT OF DEPRAVED-HEART MURDER, AND WHETHER THE VERDICT IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 13. Johnson last challenged the sufficiency of the evidence in his post-trial motion for a JNOV. This motion was denied, and Johnson now appeals arguing that the evidence was legally insufficient, and that the State failed to prove that he did not act in self-defense. Johnson contends that the overwhelming weight of the evidence establishes, at most, that he acted in the heat of passion, thereby mitigating the killing to manslaughter.
¶ 14. Our standard of review relating to the legal sufficiency of evidence is well settled:
In reviewing whether the evidence supporting a jury verdict is legally sufficient, this Court does not determine whether from the evidence we would have voted to convict or acquit. Rather, we view the evidence in the light most favorable to the prosecution and determine whether a rational juror could have concluded beyond a reasonable doubt that all elements of the crime were satisfied. The proper remedy for insufficient evidence is for the Court to reverse and render.
Readus v. State, 997 So.2d 941, 944(¶ 13) (Miss.Ct.App.2008) (internal citation omitted) (emphasis added). However, when reviewing whether the verdict is against the overwhelming weight of the evidence, we sit as a hypothetical “thirteenth juror,” and “we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Lamar v. State, 983 So.2d 364, 367(¶ 5) (Miss.Ct.App.2008) (citing Bush v. State, 895 So.2d 836, 844(¶ 18) (Miss.2005)). If an appellate court disagrees with the verdict of the jury, the proper remedy is to grant a new trial. Id. (citation omitted).

a. Sufficiency of the Evidence

¶ 15. Johnson was convicted of depraved-heart murder under Mississippi Code Annotated section 97-3-19(l)(a)-(b) (Rev.2006), which states in part:
(1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
(a) When done with deliberate design to effect the death of the person killed, or of any human being;
(b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual.
¶ 16. In the case at bar, the jury was instructed on deliberate-design murder, depraved-heart murder, and manslaughter, as well as self-defense. The jury convicted *391 Johnson of depraved-heart murder. However, it is clear from the record, that the jury had some difficulty arriving at that decision. After three and one-half hours of deliberations, the jury sent out a question to the trial judge, asking, “[wjhat is the legal difference between depraved-heart murder and manslaughter?” The defense attorney responded that the jury’s question was “a pretty good one.” The State responded that: “[Tjhere’s really no way to tell anybody what the difference between those two is, to tell you the truth, ... I don’t know that we can answer that question.” The trial judge determined that the jury instructions were adequate to explain the legal difference to the jury, so he instructed the jurors to continue their deliberations.[4] We disagree that there is no way to delineate between manslaughter and depraved-heart murder.
¶ 17. “The chief distinction between murder and manslaughter is the presence of deliberation and malice in murder and its absence in manslaughter.” Goldsby v. State, 226 Miss. 1, 15-16, 78 So.2d 762, 767 (1955) (emphasis added). Also, manslaughter by culpable negligence is distinguished from depraved-heart murder by the degree of mental culpability of a defendant. Shumpert v. State, 935 So.2d 962, 967(¶ 14) (Miss.2006) (citation omitted).
¶ 18. Construing the evidence in the light most favorable to the prosecution, we believe that a rational juror could not have concluded that all of the elements of murder were satisfied and have found Johnson guilty of depraved-heart murder. We conclude such a conviction for depraved-heart murder under the particular facts of this case rises to the level of manifest injustice. It is to be remembered that all of the eyewitnesses testified that Johnson did not seek out Franklin. Rather, testimony established that he wanted to avoid Franklin on that day and all other days. The record also reflects that there was an ongoing feud between Franklin and Johnson because of Franklin’s relationship with Starla. Testimony established that Johnson told Starla that Franklin “was sorry” (i.e. meaning worthless) and that he wanted nothing to do with him. Yet, all witnesses stated that when Franklin arrived that evening, Franklin and Starla continued to badger Johnson about his refusal to accept Franklin, pushing it to the point of yelling and a physical altercation. Moreover, all of the eyewitnesses presented by the defense and the State indicated that Johnson was attempting to drive away.
¶ 19. Additionally, Johnson had already experienced one violent episode with Franklin, which escalated to Johnson and Franklin shooting at one another. Furthermore, although the record does not indicate how long the argument between Franklin and Johnson lasted before Johnson shot Franklin, it appears from the record that it all transpired within a short period of time. Clearly, there was no premeditated or deliberate design by Johnson to effect Franklin’s death, nor do we find that the record indicates that Johnson’s actions rise to the level of evincing a depraved heart.
¶ 20. We note that there are multiple statutes applicable to the case at bar. Mississippi Code Annotated section 97-3-35 (Rev.2006) states: “The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual 'manner, or by the tose of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter.” (Emphasis added). And, Mississippi Code *392 Annotated section 97-8-31 (Rev.2006) states: “Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter.” (Emphasis added). Finally, Mississippi Code Annotated section 97-3-47 (Rev.2006) provides: “Every other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter.”
¶ 21. Although, in its brief to this Court, the State argues that Franklin was only trying to “make peace” with Johnson, the record does not fully support that assertion. Even Mizell testified that Franklin’s and Johnson’s encounter was not peaceful. She testified that Starla, Johnson, and Franklin began to argue and yell to the extent that she called her young daughter to “come into” the house. She also testified at trial, and gave a statement to the police after the incident, that Johnson had attempted to “roll off’ or move forward slowly, but Starla and Franklin were standing inside the open vehicle door. Regardless of whether Franklin initially intended to try to “make peace,” the arguing became heated enough that Mizell felt compelled to remove her child from the situation and instruct Starla, Franklin, and Johnson to “take their argument somewhere else” and to leave her premises. All testimonies confirmed that there were intense emotions between Johnson and Franklin.
¶ 22. Starla testified that:
[Johnson] didn’t want [her] ... around him with ... [Franklin] ....[,] and while she was talking to Johnson in front of Mizell’s home, [Franklin] come [sic] up driving erratically and slamming on brakes. He got out of the car and wanted to talk to my dad. My dad told him to get away from him. He didn’t have nothing [sic] to say to him. And [Franklin] ... continued persisting on wanting to talk to my dad. Then I backed up away from the truck, and my dad, his door was open. Well, when [Johnson] went to take off, [Franklin] jumped in the truck.
¶ 23. The dissent emphasizes that Star-la did not tell the police, shortly after the shooting, that Franklin attempted to hit Johnson, and the dissent finds this to be conflicting testimony. We do not find her statement on the evening of the shooting to be conflicting. At trial, Starla read her statement to the police as follows:
[Franklin] walked up to [Johnson’s] truck and said, [“]man, what’s up, John[”] [John replied,] [“] don’t want you with her.” And [Franklin] said, [“]man, we got this straight.[”] [Johnson] closed his door ... started to drive off, [Franklin] r[a]n up to the truck and [Johnson] fired.
We note that the police report actually states that “[Franklin] [ran] with [the] truck [and] [Johnson] fired.” (Emphasis added).
¶ 24. The record includes a police investigation synopsis, which summarizes a video taped interview with Starla on November 20, 2003, that includes the following:
Starla relates she was outside talking to her father in his truck when ... Franklin approached the truck.... Franklin asked ... Johnson what the problem was and Johnson said “I thought we were cool.” Johnson then stated “I don’t want you with her man.” Starla ... relates ... Johnson then began driving off and Franklin was walking beside the vehicle saying “wait [Johnson] let’s talk about this[.]” [A]t that point[,] Starla ... states she heard a gunshot and Franklin fell. Starla ... *393 describe[d] Franklin’s body position at the time he was shot as having [his] right arm on the top of ... Johnson’s truck],] and [that he] had reached his left hand in the truck.
(Emphasis added). The police investigation synopsis states that Starla was asked by Detective Smith on the evening of the shooting if she could summarize the incident, and Starla stated, “my Dad pulled up to get his phone, [Franklin] tried to talk to him[,] and my Dad shot him.”
¶25. Starla’s statements, which were given in the immediate aftermath of the altercation and shooting between her father and her boyfriend, do not refute Star-la’s or Johnson’s testimony at trial: the absence of a statement that Franklin hit Johnson is not the same as stating that Franklin did not strike, or attempt to strike, Johnson. It is our finding that these statements, in many ways, support Johnson’s account of the events: namely, that: Johnson and Franklin were arguing over Franklin’s relationship with Starla; Johnson tried to pull off; that Franklin was between the door and the truck; and Franklin had the left side of his body leaning into the truck.
¶26. Likewise, Welford testified that “Johnson tried to pull off after he ... told [Franklin] two or three times[ ] [that] [he] [did not] want to talk to [him].... [Johnson] tried to shut the door and ease off in his truck, and when he did, it choked down and went dead.” Welford also testified that during that time he had stepped outside of the vehicle to try to calm a dog that was in the bed of Johnson’s truck, and he was attempting to get back into the truck. He testified that was when Franklin became physically aggressive toward Johnson.[5]
¶ 27. On his own behalf, Johnson testified that he did not initiate any conversation or interaction with Franklin. Johnson gave the following testimony at trial:
When I pulled up to the house, Starla was on the porch. She [came] out. She had the home phone in her hand. I said, where’s my phone.... She said, [“][Franklin’s] got it.[”] He wants to talk to you. I said, I don’t want to talk to him. I said, I ain’t got nothing for him. Well, she call[ed] the cell phone[,] and he said, [“] I’m on my way.[”] So[,] he ... [pulled] up behind my truck, and he [got] out and ... [came] up to the door and ... asked what my problem was.... I told him what the problem was. I didn’t like him[,] and I wanted my phone. I got my phone. I told Starla ... I love you[,] and I’ll see you later. I started taking off, but I couldn’t shut my door because they were both standing there.
And[,] I went to pull[ ] off and shut my door, and [Franklin] struck me beside the head. I shut my door, and I starting [sic] easing off, and [Welford] was halfway out of the truck. He was trying to get in, and I think he was messing with the dog, to keep the dog from doing anything. I hit the brakes, and [Wel-ford] got in. I heard glass break, and I turned to look, and he come [sic] through the window on me, and I grabbed my pistol. I thought I shot him in the shoulder.
*394 ¶ 28. The supreme court case Wade v. State, 748 So.2d 771, 775(¶ 12) (Miss.1999) is analogous to the case at bar. In Wade, the supreme court stated: “This Court recognizes the theory of ‘imperfect self-defense’ whereby an intentional killing may be considered manslaughter if done without malice but under a bona fide (but unfounded) belief that it was necessary to prevent death or great bodily harm.” Id. (citing Lanier v. State, 684 So.2d 93, 97 (Miss.1996)). In Wade, the supreme court upheld this Court’s decision that Deanna Wade acted in the heat of passion or with the bona fide, but unfounded, belief that her boyfriend was going to beat her again. Id. at 773 (¶¶ 4, 7). Wade had suffered numerous beatings at the hands of her boyfriend, and on the night she shot him, he had beaten her head against a table with enough force to cause a sign to fall off a wall. Id. at (¶ 5). Wade testified that she wanted to call her mother to come and get her, but she could not use the telephone because the phone in the bar had been knocked off the wall. Id. at (¶ 6). Wade went to a nearby house which she shared with her boyfriend, returned to the bar with a gun, and told her boyfriend, as he moved toward her, that “you ain’t gonna hit on me no more” before she shot him. Id. The supreme court affirmed this Court’s holding wherein we found that although Wade may have been mad, it was clear “her ill will was engendered by the earlier unlawful acts of [her boyfriend] and what appeared to be a renewed attack.” Id. at (¶ 7). As in Wade, the evidence presented in the record supports that Johnson acted out of the heat of passion or he acted with a bona fide, but unfounded, belief that Franklin intended him great bodily harm.
¶ 29. The supreme court defines “heat of passion” as follows:
[A] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
Givens v. State, 967 So.2d 1, 11 (¶ 33) (Miss.2007) (quoting Mullins v. State, 493 So.2d 971, 974 (Miss.1986)). Stated differently, in order for a crime to be reduced from murder to manslaughter, circumstances must exist that would rouse a normal mind “to the extent that the reason is overthrown and that passion usurps the mind destroying judgment.” Graham v. State, 582 So.2d 1014, 1018 (Miss.1991) (citation omitted).
¶ 30. The State argues that Johnson’s past relationship with Franklin and the shooting incident three months earlier were insufficient for the jury to infer that Johnson’s passions were aroused to the point that his “reason [was] overthrown and that passion usurpfed] the mind destroying judgment.” The State relies on Alford v. State, 5 So.3d 1138, 1142-43 (¶ 16) (Miss.Ct.App.2008) to support its assertion that any past argument between Johnson and Franklin was insufficient to satisfy the heat-of-passion element of manslaughter, and the State argues that “the provocation must be immediate — that is, occurring at the time of the killing.” Alford is analogous to the case at bar, but unlike the victim in Alford, Johnson, according to the witnesses’ testimonies, was provoked by Franklin at the time of the killing.
¶ 31. In Alford, the victim was confronted by Lasharis Alford. Id. at 1139 *395 (¶ 2). The victim removed himself from Alford’s presence by going to another location. Id. Alford followed him and threatened him, but not taking Alford seriously nor appearing provoked, the victim made the off-handed comment “well, shoot me then,” and pointed a finger to his temple. Id. at (¶ 3). Alford then shot the victim four times, two of which were to the victim’s head. Id. at (¶ 6). In Alford, the trial court refused to allow a jury instruction on manslaughter. Id. at 1142 (¶ 14). This Court affirmed the trial court’s judgment. Id. at 1143 (¶ 18). Indeed, “the supreme court has repeatedly maintained that jury instructions on lesser-included offenses should not be indiscriminately granted but should be submitted to the jury only when there is an evidentiary basis in the record.” Id. at 1142 (¶ 15) (citing Sanders v. State, 781 So.2d 114, 119 (¶ 16) (Miss.2001)). The actions of the defendant and victim in Alford are inverse to the case at bar.
¶ 32. The explosive events of that fateful evening were undoubtedly fueled by resentment and fear. Johnson and Franklin not only had a history of arguing over Franklin’s relationship with Johnson’s daughter, Starla, but Johnson and Franklin had already engaged in a violent encounter three months earlier. Certainly, when Johnson was embroiled in the argument with Franklin, the events were overshadowed by the incident three months earlier, wherein Franklin arrived at Johnson’s house wearing a bullet-proof vest and armed with a baseball bat and a gun. Johnson, unwaveringly testified that: Franklin had something “shiny” in his hand; he heard what sounded like a bottle breaking; and Franklin was physically reaching into the vehicle to physically attack him. The dissent relies heavily on the fact that no broken glass was found, but after a thorough and contemplative review of the record, we find that the lack of a broken beer bottle did not overcome Johnson’s account of his subjective belief of what had transpired.
¶ 33. As stated, Mizell testified that Johnson arrived at her home to see Starla, not Franklin. She further testified that Johnson and Starla began to argue from the time Johnson arrived because of her relationship with Franklin. Mizell also testified that: Johnson never left his truck, and Franklin and Starla were situated inside the open driver’s-side door. She testified that the arguing became so intense that she needed to remove her young daughter from her front yard and tell Johnson, Franklin, and Starla to leave. Mizell did not dispute that Franklin had a beer bottle in his possession. The only point on which Mizell’s testimony differs from the other eyewitnesses is whether Franklin ever hit Johnson. However, the record is clear that Mizell was not outside with Johnson, Franklin, and Starla during the entire incident.
¶ 34. During cross-examination, the defense counsel, when referencing Mizell’s statement to the police right after the shooting, asked Mizell if she had stated the following to the police: “My daughter[,] Allison, was outside the gate with Starla when [Franklin] pulled up. I heard yelling, so I called for my daughter to come in.” Mizell answered: “Uh-huh. I got her inside and came right back out. I put her on the couch and came right back out.” She also stated that she was the furthest person from the incident. Moreover, even though Mizell testified that the lighting was adequate for her to see, it was already dark when the argument and shooting occurred. By Mizell’s own testimony, it is clear that she was unable to state with certainty that the account given by all of the other eyewitnesses was false. Furthermore, the autopsy report verified that Johnson fired a single shot at close range *396 near Franklin’s left armpit. Dr. McGarry testified that the location of the wound corroborated Johnson’s account of Franklin leaning into the vehicle while Johnson was trying to drive away. And, the police report indicates that Starla told police that Franklin had his left arm within the truck about the time that Johnson shot him.
¶ 35. “[Njeither we, no[r] the jury, should test [a defendant’s] reaction by the same calm, cool, judgment that we can, in complete detachment therefrom .... ” Bell v. State, 207 Miss. 518, 528, 42 So.2d 728, 731 (1949). From the facts delineated above, we think it conclusive that Johnson believed, possibly an unreasonable belief, that he was in immediate danger of suffering great bodily harm or death at the hands of Franklin. Therefore, viewing the evidence in the light most favorable to the prosecution, we determine that upholding the jury’s verdict of depraved-heart murder would be to sanction an unconscionable injustice. The proper remedy is to reverse and render for re-sentencing for manslaughter under the direct-remand rule.
¶ 36. Utilizing the direct-remand rule, an appellate court may remand a case to the trial court for sentencing on a lesser-included offense where the greater offense was not proved, but the elements of the lesser-included offense were sufficiently met. Shields v. State, 722 So.2d 584, 587(¶ 7) (Miss.1998) (citation omitted). The supreme court explained that the logic behind the direct-remand rule was that “guilt of a true lesser[-]included offense is implicitly found in the jury’s verdict of guilt on the greater offense.” Id. (citations omitted). “The direct-remand rule has also been followed in numerous other state and federal courts, with varying rationales, either statutory, rule based[,] or inherent power.” Id. at 585(¶ 8).
¶ 37. The record supports that Johnson lacked malice aforethought or wanton recklessness when shooting Franklin during the altercation. Rather, we find that the record supports that Johnson subjectively believed that he was under attack by Franklin. Accordingly, we find that Johnson’s actions were more like the defendant in Wade than in Alford. Therefore, the killing was more appropriately a killing in the heat of passion or a situation of imperfect self-defense. Accordingly, manslaughter was the only appropriate verdict that could be justified by the evidence in this case.

b. Overwhelming Weight of the Evidence

¶ 38. The supreme court in Bush, 895 So.2d at 844(¶ 18) discussed the standard of review for whether a verdict is contrary to the weight of the evidence stating:
When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. We have stated that on a motion for new trial,
[this] [C]ourt sits as a thirteenth juror. The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.
However, the evidence should be weighed in the light most favorable to the verdict. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, unlike a reversal based on insufficient evidence, does not mean that acquittal was the *397 only proper verdict. Rather, as the “thirteenth juror,” the court simply disagrees with the jury’s resolution of the conflicting testimony. This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves. Instead, the proper remedy is to grant a new trial.
(Internal citations and quotations omitted). In other words, the appellate court is dealing with matters of fact, which is a matter for a jury. The dissent opines that we have “invaded the province of the jury,” and in a sense that is true. When the claim is that the verdict is against the weight of the evidence, the charge to this Court is to enter into the province of the jury as a thirteenth juror and determine whether the weight of the evidence tips the scales of justice in favor of the verdict.
¶ 39. For the reasons already stated, we find that the evidence preponderates heavily against a depraved-heart-murder conviction given that the record does not support that Johnson’s actions were motivated by malice or wanton recklessness. The record supports that Johnson overreacted to an altercation with Franklin based upon an unreasonable belief of suffering imminent physical harm. Under many circumstances, when determining the weight of the evidence, the proper remedy is to remand for a new trial. However, as explained above, we have determined that the evidence presented was also legally insufficient to support a depraved-heart-murder conviction, which calls for this Court to reverse and render. Arguments that verdicts are both against the sufficiency and the weight of the evidence may create a “tug of war” as to the correct remedy. This indeed is the type of situation which implicates the direct-remand rule.
¶40. It is well settled that manslaughter is a lesser offense of murder.[6] McCune v. State, 989 So.2d 310, 316 n. 13 (Miss.2008). And, we find the record provides ample support for a verdict of manslaughter but not for murder. A new trial is appropriate where the possibility of guilt still exists for both the principal and the lesser-included offense. Wade, 748 So.2d at 775(¶ 14). Given that the record does not provide legally sufficient evidence to support Johnson’s conviction of depraved-heart murder, a new trial, which would be the remedy under a weight-of-the-evidence review, is not appropriate. Accordingly, pursuant to the guidance of Wade and Shields, we reverse, render, and remand for re-sentencing under the direct-remand rule, rather than remand for a new trial.
II. WHETHER THE STATE PROVED WHETHER JOHNSON ACTED IN NECESSARY SELF-DEFENSE.
¶ 41. In light of the evidence reflected in the record, we find that a verdict of murder rises to the level of a manifest injustice. However, “when the jury found that the defendant was guilty of murder, it necessarily found that defendant was guilty of homicide which was not justifiable or excusable, thus rejecting the defense of self[-]defense and accident.” Dedeaux v. State, 630 So.2d 30, 33 (Miss.1993) (quoting Wells v. State, 305 So.2d 333, 339-40 (Miss.1974) (McGehee, J. concurring)) (emphasis added). A defendant simply saying that he or she shot someone in self-defense or that the shooting was an accident in and of itself does not provide a *398 defendant with a right to a jury instruction on self-defense, nor does it obligate a jury to accept such defense. See Chinn v. State, 958 So.2d 1223, 1231(¶ 39) (Miss.2007) (Easley, J., dissenting) (citing Robinson v. State, 726 So.2d 189, 194(¶ 19) (Miss.Ct.App.1998)). The jury was required to find that, not only were Franklin’s actions toward Johnson such that a “reasonable person” would have felt threatened with serious bodily harm or death, but also that under similar circumstances, a “reasonable person” would have thought it necessary to inflict serious bodily harm or death to thwart the attack. Ellis v. State, 956 So.2d 1008, 1014(¶ 12) (Miss.Ct.App.2007) (The court upheld a jury instruction that called for the jury to find that a reasonable person would have thought the defendant’s actions were necessary to prevent serious bodily injury or death). In other words, “[t]he apprehension or fear that will justify killing another in self-defense must appear objectively real to a reasonable person of average prudence.” Wade, 748 So.2d at 775(¶ 13) (citing Hart v. State, 637 So.2d 1329, 1339 (Miss.1994)).
¶ 42. The jury in fact was instructed regarding self-defense with instructions S — 10, D-8A, and D-9. Jury instruction D-9 specifically stated that in order to find Johnson not guilty of assaulting another, “[t]he danger to life, or of great bodily injury, must be imminent, present at the time of the shooting, and be so urgent that there is no reasonable mode of escape except to shoot the other person.’’ (Emphasis added). Johnson’s claim of necessary self-defense has one glaring flaw: He occupied a vehicle that obviously had the capability to provide him a means of escape from Franklin’s presence. Although testimony was given that Johnson’s vehicle stalled at one point, after the shot was fired, Johnson drove away in his truck. The jury rejected Johnson’s claim of self-defense. Athough we believe that the evidence supports a case of heat-of-passion manslaughter or imperfect self-defense, we conclude that a reasonable juror of average prudence could have determined from the evidence that Johnson had a “reasonable mode of escape” from the situation. This issue is without merit.
¶ 43. The hearing transcript gives us pause over the trial judge’s and trial counsels’ confusion over the distinction between depraved-heart murder and manslaughter. We recognize that distinguishing between the two may often be “murky.” Steele v. State, 852 So.2d 78, 80 (¶ 10) (Miss.Ct.App.2003). Therefore, we will attempt to lend guidance to their quandary.
¶ 44. In the pivotal case of Windham v. State, 602 So.2d 798 (Miss.1992), the supreme court stated that the traditional view of depraved-heart murder had “evolved.” The Windham court held that:
Under the traditional view, death which resulted from a reckless act directed toward a paHicular individual would not be deemed to be within the scope of depraved-heart murder statutes. To constitute depraved-heart murder, the act must have manifested a reckless indifference to human life in general. For example, an unjustified shooting at a passing train or into a house, which generally poses a risk to a group of individuals and which results in death, is a familiar example of traditional depraved-heart murder.
The traditional view has since evolved. An act which poses a risk to only one individual and which results in that individual’s death may also be deemed depraved-heart murder. For example, death which resulted from a beating has been deemed to be within the scope of depraved-heart murder statutes.
*399 Id. at 802 (internal citations omitted). Nevertheless, abandonment of the traditional view was not without its critics.
¶ 45. In his concurring opinion in Windham, Presiding Justice Hawkins stated serious misgivings. Id. at 804 (Hawkins, P.J., concurring). Justice Hawkins opined that the court’s expansion of the statute to encompass reckless acts evincing a depraved heart or malice toward an individual as well as no “particular individual,” would create problems for the prosecution, defense, and the court. Id. at 806. The instant case indicates that it has done just that.
¶ 46. As stated, during deliberations, the jury requested that the court give them further instructions on the legal difference between depraved-heart murder and manslaughter. The responses from the court and the attorneys were as follows:
The Court: I’ll read the question ... the jury has sent out ..., “What is the legal difference between depraved-heart murder and manslaughter?”
Mr. Shaddock [defense attorney]: That’s a pretty good one.
The Court: So do you need time to look at the jury instruction before I come back? What says the State?
Mr. Knochel [State]: On behalf of the State, Judge, there’s really no way to tell anybody what the difference between those two is, to tell you the truth, and I don’t know that we can answer that question.
The Court: Well, it appears to me that if you look at how you all laid out the jury instructions, it sets out exactly what they’re looking at. Murder — It defines deliberate design, et cetera, depraved heart, then they go to manslaughter. It seems to me they’ve been correctly and adequately informed. Mr. Shaddock, your position, please?
Mr. Shaddock: Well, I think you can.... I think what the jury is struggling with, Judge, is the distinction between the two. I think the real distinction is depraved heart — the definition of depraved heart.
The Court: Well, and you and I have had this discussion as we think students of the law dealing with that whole issue of depraved heart and deliberate design—
Mr. Shaddock: Yes sir.
The Court: — and you have argued it before the [s]upreme [c]ourt[,] and the Mississippi Supreme Court[ ][has] made it very clear they are synonymous. You know, we can argue that, whether they are, but the [s]upreme [c]ourt has spoken. I can’t see anything else to tell them....
It is apparent that even the trained legal professionals were grappling with determining a clear distinction between a depraved-heart murder of a specific individual and the lesser offense of manslaughter. Perhaps in his concurrence in Windham, Presiding Justice Hawkins was prophetic when he stated that “[w]hether [a] defendant is convicted of murder or manslaughter will depend upon the whim or circumstance of the jury hearing the case, not upon understandable instructions delineating what constitiotes each crime.” Windham, 602 So.2d at 805 (emphasis added). This possibility was manifested in the instant case. At the close of Johnson’s motion for a new trial, the circuit judge stated, “the deliberate [-] design [or] depraved-heart issue causes problems ... for everyone.” He went on to state that “further guidance on that issue may be very helpful to not only defense attorneys and their clients, but [also] to the State of Mississippi.”
*400 ¶ 47. There is no “one-size-fits-all” answer to the circuit judge’s question: “Each case must depend upon its own facts and circumstances.” Wade v. State, 724 So.2d 1007, 1011(¶ 13) (Miss.Ct.App.1998) (citation omitted). However, that is not to say that our case law lacks guidance about how to distinguish between deliberate-design murder, depraved-heart murder, and manslaughter. We begin with the supreme court’s view of Mississippi Code Annotated section 97-3-19.
¶ 48. In Mallett, 606 So.2d at 1095, the supreme court stated the following:
There is no question that the structure of the statute suggests two different kinds of murder: deliberate[-]design/premeditated murder and depraved[-] heart murder. The structure of the statute suggests these are mutually exclusive categories of murder. Experience belies the point. As a matter of common sense, every murder done with deliberate design to effect the death of another human being is by definition done in the commission of an act imminently dangerous to others and evincing a depraved heart, regardless of human life. Our cases have for all practical purposes coalesced the two so that [s]ection 97 — 3—19(l)(b) subsumes (l)(a).
(Citations omitted). In Windham, Presiding Justice Hawkins pondered whether such coalescing of subsection (l)(a) and (l)(b) would enter into manslaughter’s domain, for “[e]very instance of a slaying in the heat of passion is perforce committing an act dangerous to another.” Windham, 602 So.2d at 805 (Hawkins, P.J., concurring). It has not. It is imperative to remember that whereas the supreme court has stated that Mississippi Code Annotated section 97-3-19(b) subsumes section 97-3-19(a), it has not subsumed our manslaughter statutes. See Mallett, 606 So.2d at 1095. Failure to remember this distinction would make the practical effect, of coalescing section 97-3-19(a) and (b), to deny the trial court of its ability to issue a directed verdict that a defendant was guilty, at most, of manslaughter. Windham, 602 So.2d at 808 (Robertson, J., concurring).
¶ 49. When recognizing the possible blurring of the line between depraved-heart murder and manslaughter, Justice Robertson mused that “we are not told ... how and why this would be a loss to the law or the society it serves.” Id. Certainly, it would be a loss of the just and consistent application of law, as well as to the defendants not truly guilty of murder that would face life in prison rather than a lesser sentence for manslaughter, which has been provided for by our Legislature.[7] Since each case is dependent upon its unique facts, we look to the line of cases that abandoned the traditional view of depraved-heart murder to analyze what types of defendants’ actions exemplify a depraved-heart murder.
¶ 50. As already touched upon, the cases that discarded the distinction between an act done with deliberate design to effect the death of the person killed and an act imminently dangerous to no particular individual were Johnson v. State, 475 So.2d 1136 (Miss.1985) and Windham. In Johnson, the court was faced with a defendant who had brutally beaten her three- and-a-half-month-old child and the testimony of the pathologist that revealed the child had been abused before. Johnson, 475 So.2d at 1142. At the opposite end of *401 the age spectrum, the Windham court was faced with an attack upon an elderly man and his wife. Windham, 602 So.2d at 799. The Windham defendant savagely struck a seventy-nine-year-old, one-armed man in the head with a hammer, at least once, because the victim told the defendant he could no longer charge gasoline at the victim’s store due to an unpaid bill. Id. Although the Windham defendant claimed that he had no intention of killing the victim and that he believed the victim was going into his store to get a weapon, the facts were that the elderly gentlemen had turned away from the defendant; rather than get in his car and leave, the defendant bludgeoned the victim to death with a hammer. Id. Considering the horrendous facts of these cases, it is plausible that Justice Robertson was correct in his concurrence that the court sensed who should be sentenced, and struggled to imply intent to kill from the use of a deadly weapon. Id. at 807 (Robertson, J., concurring).
¶ 51. Within months of Windham, the supreme court decided Mallett. In Mal-lett, the defendant and the victim had also engaged in a verbal dispute, and the defendant claimed that he killed in self-defense because the victim threatened to kill him. Mallett, 606 So.2d at 1094. However, testimony revealed that the defendant had left the bar, in which the two had argued, and waited nearly five minutes for the victim to leave the establishment. Id. The court found that the jury could have believed that the Mallett defendant was lying in wait for the victim and fired at the victim a moment after the victim emerged. Id.
¶ 52. Fast-forwarding a decade, the supreme court affirmed a depraved-heart-murder conviction in Webster v. State, 817 So.2d 515, 522-23(¶ 34) (Miss.2002). J.W. Webster had gone to the home of his ex-girlfriend and got into an argument with her current boyfriend. Id. at 517(¶ 5). Webster left the home after his ex-girlfriend instructed her son to call the police. Id. Webster returned to the home, took a knife from the kitchen, then went to where the victim was and stabbed him in the back on the left side. Id. at (¶ 7). Webster then chased the victim through the yard and stabbed him again in the chest. Id. at 517-18 (¶¶ 7-10). Whether Webster “intended” to kill the victim or not, certainly his actions exemplified a “depraved heart” or “evil intent.”
¶53. In one last gruesome picture of depraved-heart murder, we look at McDowell v. State, 984 So.2d 1003 (Miss.Ct.App.2007). Following an altercation between co-defendant Barbara “Bobby” Chapman and her ex-boyfriend, Marloh Maurice Davis, Chapman and her son, Eric Pierre McDowell, returned to the apartment and waited for Davis to return. Id. at 1008 (¶¶ 3-5). Chapman had actually returned to the apartment looking for Davis several times that afternoon. Id. at (¶ 5). When Davis finally returned, Chapman engaged him in conversation while her son ran up from behind and began beating him with a wooden stick wrapped in tape. Id. at 1009(¶ 9). Even after Davis had fallen to the ground, McDowell continued beating him in the head with the stick and repeatedly stomping Davis. Id. Forensic evidence indicated that Davis may have been unconscious after the first blow. Id. at 1010(¶ 18). Davis died from a combination of blunt force head trauma and liver laceration. Id. at (¶ 11). Chapman testified that she had her son beat Davis, but Davis was not supposed to die. Id. It stretches the imagination to believe that such a senseless and brutal beating, committed hours after an altercation, could have been done with less than a “depraved heart” or “evil intent.”
*402 ¶ 54. We review these earlier eases wherein the supreme court or this Court has found that the defendant committed depraved-heart murder in order to compare and distinguish the actions of those defendants to the defendant in the instant case, as well as other similarly-situated defendants. The victim in this case, Franklin, was the particular individual Johnson intended to harm, albeit in a claim of necessary self-defense. There was no innocent bystander nor unintended victim killed as is the circumstance intended to be covered under the traditional view of the depraved-heart murder statute. Furthermore, this is not a savage or merciless fatal beating where the defendant claims no specific intent to kill. The record in the case at bar simply does not reflect the depravity and calculated deliberate acts exhibited by the defendants in these prior cases; it reflects the actions of one acting more rashly-out of the heat of passion but with a mistaken claim of necessary self-defense.
CONCLUSION
¶ 55. The argument that ignited between Johnson and Franklin on that fateful evening was fueled by their animosity toward one another because of Franklin’s relationship with Johnson’s daughter, Star-la, as well as their violent history. Also, Johnson was not the aggressor in this situation. Further, all eyewitnesses agreed that Johnson attempted to remove himself from the scene. The record clearly evinces that this was a killing in the heat of passion and arguably a case of imperfect self-defense. As such, manslaughter is the only outcome this Court can sanction.
¶ 56. THE JUDGMENT OF THE CIRCUIT COURT OF JACKSON COUNTY OF CONVICTION OF DEPRAVED-HEART MURDER IS REVERSED, AND THIS CASE IS REMANDED FOR RE-SENTENCING ON THE LESSER-INCLUDED OFFENSE OF MANSLAUGHTER IN ACCORDANCE WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JACKSON COUNTY.
KING, C.J., GRIFFIS, BARNES, ISHEE and MAXWELL, JJ., CONCUR. LEE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MYERS, P.J., IRVING AND CARLTON, JJ.

. Johnson testified that Franklin refused to leave his home and threatened "to get” Johnson’s nephew. Past that, the record does not detail what triggered such a violent wrangle between the two.

. There was broken automobile glass found on the floorboard on the passenger’s side of Johnson's vehicle, but it is undisputed that the glass did not come from a beer bottle or any events that happened that evening.

. The autopsy report was admitted into evidence. Therefore, the jury had it with them during deliberations.

. Neither party raises any issue concerning error related to the jury instructions.

. The dissent notes that Welford did not give a statement to the police for at least a couple of months after the incident. This is correct. The police investigation synopsis report states that Welford was interviewed by Detective Smith at the George County Regional Jail on February 10, 2004. The report states that Welford wished to make a statement concerning the incident despite being informed by the detective that "he did not have to make a statement if he did not wish to.”

. Although it is common throughout our case law to refer to manslaughter as a "lesser-included offense” of murder, the supreme court in McCune stated that: "[L]esser-in-eluded, offense is a misnomer. The Court considers manslaughter to be a lesser offense of murder.” McCune, 989 So.2d at 316 n. 13 (emphasis added).

. Mississippi Code Annotated section 97-3-25 (Rev.2006) states: "Any person convicted of manslaughter shall be fined in a sum not less than five hundred dollars, or imprisoned in the county jail not more than one year, or both, or in the penitentiary not less than two years, nor more than twenty years."