# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-KA-00923-SCT

*CHRISTOPHER O'NEIL McCUNE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/12/2007 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | NEWTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES EDWIN SMITH, III |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: DESHUN TERRELL MARTIN |
| DISTRICT ATTORNEY: | MARK SHELDON DUNCAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/17/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., GRAVES AND RANDOLPH, JJ.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     Christopher O'Neil McCune was indicted for murder and aggravated assault. A jury trial was held in the Circuit Court of Newton County following the denial of McCune's motion for change of venue. The circuit judge denied McCune's proposed lesser-offense instructions regarding manslaughter. A jury of McCune's peers found him guilty as charged on both counts. McCune was sentenced to life imprisonment for the murder conviction and to an additional twenty years, to run consecutively to the sentence of life imprisonment, for the aggravated assault conviction. Following denial of his "Motion for a New Trial or Other Relief," McCune filed notice of appeal.

**FACTS**

¶2.     On August 13, 2006, at approximately 2:15 a.m., Cathy Hardy arrived at James "J.J." Bolton's house, accompanied by a friend. Around 2:45 a.m., Hardy and Bolton left for Hardy's house in Bolton's vehicle, as she was concerned she had left the stove on. While they were returning to Bolton's house, a white Chevy Suburban passed them slowly. According to McCune, the driver of the white Suburban,[1] "I went past [Bolton] because he was driving sort of slow." Hardy testified that McCune began "pushing on the brakes[,]" and made a left turn. Bolton then pulled up behind McCune's vehicle. Hardy "noticed [McCune] and [Kidd] standing outside the car." Hardy testified that Bolton then rolled his window down "and [McCune] asked him, why the [f] did he stop the [mf] truck. And [Bolton] told him, 'Man, I was just trying to see what was up.'" In contrast, McCune testified that he did not recall using profanity and merely got out of his vehicle "and asked [Bolton] what was up and asked him, what's going on, you know, 'Why don't you go ahead on,' . . . because [there] had been some threats made and things of that sort."[2] According to Hardy, McCune "asked [Bolton] again why did he stop the [f]'ing truck. And [Bolton] told him, 'Man, I was just trying to see what was up.' And [McCune] replied, 'You done caused enough [s...] on

_____

[1]He was accompanied in the vehicle by Kafien Kidd, Jonathan Perrilliat, and Anthony Arrington.

[2]McCune testified that he had known Bolton "practically all my life. Me and him went to school together[,] . . . knew him from . . . [the] neighborhood that we lived in. All of us come in contact pretty frequent." According to McCune, threats had been made "[t]o me and also members of my family . . ., threats made that [Bolton] was going to do something about shooting in my sister house[,] . . . at the time I was staying there." McCune conceded that Bolton "didn't make [threats] directly to me. But some people that associated with him and I had said that he had." Of greater import, McCune testified that Bolton made no threats to him that evening.

2

these streets.'" Hardy testified that Bolton replied, "'Man, I wouldn't do you like that,' and he replied to [Kidd], 'And, man, you know I wouldn't do you like that.'"[3] According to McCune, he then asked Bolton "to go on twice[,]" without success.[4] Hardy testified that as she "leaned up to look at [McCune], [Bolton] was barely brushing the side of my thigh, as if he was trying to get my attention. So I just leaned up, and that's when I noticed that [McCune] had a gun at his side." Hardy then "told [Bolton] that he didn't have a gun, let's leave. He was just – but he wasn't reaching down. He wasn't doing none of that."[5] McCune testified that he "noticed [Bolton] was reaching for something. I know [Bolton] carry a gun. I mean, I have saw him with a gun before.[6] I didn't know what to do at the time. So, as he was reaching for his gun,[7] that's when I pulled my gun." Immediately thereafter, according to Hardy, "the gun just started going off." According to McCune, he began shooting "*out of self-defense* . . . because I felt like he was going to do something to me." (Emphasis added). McCune testified that he shot until he ran out of bullets because "I didn't know if I had shot him or not. It happened real fast."

---

[3]Hardy testified that Bolton was "talking nice" to McCune and made no verbal threats or threatening gestures.

[4]McCune admitted that he likewise could have gotten back into his vehicle and left, but did not.

[5]On September 6, 2006, Hardy gave a voluntary statement that, "I felt [Bolton] touching the side of my lap. So I looked up at [McCune] and noticed that he had a gun in his right hand. I leaned back and told [Bolton], 'Let's just go, you don't have a gun in here.'"

[6]McCune admitted that he did not see Bolton with a gun "that particular night . . . ."

[7]McCune later testified that he had assumed Bolton was reaching for a gun.

3

¶3.     According to Hardy, "[a]fter the shots had stopped firing, I noticed [Bolton] had took his left hand and took his shirt and brushed his shirt.  That's when I noticed he had a bullet hole in his shirt.  I leaned back up . . . and I seen [McCune] with the gun in the window."  Hardy testified that McCune was pointing the gun toward her head and "the gun fired and something just told me to get out and run and I just ran."  As Hardy ran away, she heard McCune yell, "'Bitch, you better run or I'll kill you, too.'"  McCune denies shooting at, or even speaking to, Hardy.  According to McCune, "I never noticed [Hardy] at all. . . . [A]s we was headed back to the truck, I saw somebody running . . . .  I didn't know who she was."

¶4.     Robert and Margaret Moore, who lived in a nearby home, were awakened by the gunshots.  Margaret testified that she "heard a lot of commotion.  And then as the guy was walking back to the white Suburban, I heard him say, 'And I'll kill you, too.'"  According to Robert, the white Suburban then "sped off as I was going out the back door, as I took two or three steps toward the roadway."  After hiding briefly at a nearby church, Hardy returned to Bolton's vehicle and testified that:

> I was going to just sit on top of [Bolton] and try to drive him home.  That's what was in my mind I was thinking to do.  And when I turned back and looked again, I seen the [white Suburban] coming back and it was coming back real fast, so I took off running again.

According to Robert:

> I heard [the white Suburban] as it was making the block.  It came around – it was just gassing it all the way around to each stop.  When I heard it turn to come back toward me, that's when I got in the defensive posture trying to see what they was going to do.

Hardy testified that she heard McCune again threaten her, stating "[y]ou better run or I'll kill you." She then ran to Robert, who was standing outside with a gun in his pocket, and told him she "thought [McCune] was going to kill me." According to Robert:

> [b]y the time the truck made it back around, [Hardy] had braced herself right behind me. She came from the left side of the vehicle and she just grabbed me like this here. "Mr. Robert, Mr. Robert, they going to kill me." She was holding on to my robe, and I was trying to calm her down.

McCune's vehicle pulled up at the corner of the Moores' house, paused for five or ten seconds, and then drove away. According to McCune, he "came back to the scene because I was going to make sure that [Bolton] had got him some help there. . . . And when I saw [Robert] and [Hardy] standing there, I just drove, kept on driving."

¶5. The investigating officers found no weapons in Bolton's vehicle. Leon Reed, a detective with the Newton Police Department, testified that they "found 14 rounds that had been shot from a nine millimeter on the ground, the hulls." A firearms expert with the Mississippi Crime Laboratory testified that all of the casings "were fired from the same gun." Additionally, according to Reed, one bullet "went through the vehicle and hit the passenger side of the vehicle right in the edge of the window, bottom part of the window in the door." An autopsy revealed a total of twelve gunshot wounds, with at least two of the bullet wounds being lethal. Several days later, McCune was apprehended in Lexington, Kentucky.

¶6. On January 30, 2007, McCune was indicted for murder, in violation of Mississippi Code Annotated Section 97-3-19(1)(a),[8] and aggravated assault, in violation of Mississippi

---

[8]Mississippi Code Annotated Section 97-3-19(1)(a) provides, "(1) The killing of a human being without authority of law by any means or in any manner shall be murder in the following cases: (a) When done with deliberate design to effect the death of the person

Code Annotated Section 97-3-7(2)(b).[9] On February 15, 2007, McCune filed a motion for change of venue arguing that reference to him in articles published in The Newton Record "caused the prospective jurors in this cause to hear information which is erroneous, inflammable, and highly prejudicial in this cause, and has prejudiced these prospective jurors against him."

¶7. A hearing was held on McCune's motion for change of venue. McCune offered two Newton County residents as witnesses, his mother and aunt,[10] who each testified that they did not believe McCune could receive a fair trial in Newton County.[11] McCune also introduced a newspaper article from The Newton Record which read:

> [i]n the pre-dawn hours of August 13, a shooting left a Newton man dead, and a woman and her baby believed kidnaped. The woman and child were safely returned to Newton, while Newton resident "J.J." Bolton was killed at 3 a.m. on that Sunday morning on Oak Street during an alleged altercation with

killed, or of any human being . . . ." Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2006).

[9]Mississippi Code Annotated Section 97-3-7(2)(b) provides, in part, that:

(2) A person is guilty of aggravated assault if he . . . (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; and, upon conviction, he shall be punished by imprisonment in the county jail for not more than one (1) year or in the Penitentiary for not more than twenty (20) years.

Miss. Code Ann. § 97-3-7(2)(b) (Rev. 2006).

[10]Kidd's mother.

[11]Betty Buckley, McCune's mother, specifically testified that Bolton owned a local store, his father owned a local body shop, his aunt is an alderman for the City of Newton, and several of Bolton's relatives are employed by the Newton Police Department. As such, she testified that "[b]ecause of . . . the publicity, the people that's involved with the families, I just don't think it would be fair."

6

[McCune] and [Kidd]. According to police reports, Bolton was driving his Cadillac Escalade on Oak Street at around 3 a.m. on Sunday when a white, older model Suburban cut in front of him. Words were exchanged and the suspects got out of their car and fired several shots into the Escalade killing Bolton. Newton Police Chief Curry said [when] McCune and Kidd were done with their rounds they proceeded to drive away, but returned to "possibly kill the witness" who was in the car with Bolton but had fled the scene by the time they returned.

Accused in the killing were [McCune], [Kidd], [Arrington] and [Perrilliat].

The State offered six Newton County residents as witnesses,[12] four of whom had heard about McCune's case on the news or read about it in The Newton Record, and each testified that they believed McCune could receive a fair trial in Newton County. Regarding extensive media exposure, the circuit judge stated:

> the only evidence I have other than the testimony of various witnesses was that there was only one account. And, of course, this Court knows that there were more accounts published in The Newton Record than the one account. I know that. But as far as this hearing is concerned, I only know of one; and reading that one report, there's no evidence to me that report would cause a fair and impartial juror to prejudge the guilt of [McCune].

As to "serious crimes against members of prominent, influential families or serious crimes against public officials and serious crimes such as mass or serial murders[,]" the circuit judge found "that's nonexistent in this case, other than the testimony of a mother and an aunt who say that the victim's family was more prominent than [McCune] . . . ." The circuit judge then provided that "[t]he Supreme Court in numerous Mississippi cases has on numerous times stated that during voir dire, if jurors can state that they can be fair and impartial, then that's

---

[12]Among the witnesses were a local minister; a school teacher/football coach with the Newton County School District; and an election commissioner/president of the Newton County School Board.

the linchpin of a fair and impartial trial." The circuit judge found there was not an extensive level of adverse publicity and the coverage was not inflammatory, but merely "reporting the incident itself[,]" that "[t]he extent and effect the publicity had upon the venired persons in the case, [is] a matter . . . [to be] determine[d] . . . in voir dire examination." The circuit judge concluded that "considering the totality of the case, the evidence of the case, the publicity of the case, the testimony that I've heard, . . . that [McCune's] motion for change of venue should be denied."

¶8. On April 9, 2007, the jury trial commenced. Following the State's case-in-chief, McCune made a motion to dismiss, which was overruled. After presentation of McCune's case, he offered jury instructions, discussed *infra*. The jury found McCune guilty as charged on both the murder and aggravated-assault counts. On April 10, 2007, the circuit court sentenced McCune to life imprisonment for the murder conviction and to twenty-five years imprisonment for the aggravated-assault conviction, with "said sentence to run consecutive to the sentence imposed in Count One hereof." On April 12, 2007, the circuit court filed an "Amended Judgment" as to the sentence for McCune's aggravated-assault conviction, because "Section 97-3-7 of the Mississippi Code provides only a maximum allowance of twenty (20) years for the crime of aggravated assault." That twenty-year sentence was imposed to run consecutively to the sentence of life imprisonment imposed in Count One.

¶9. Subsequently, the circuit court entered an order overruling McCune's "Motion for Judgment Notwithstanding the Verdict or, in the alternative, Motion for New Trial," and later entered an order overruling McCune's "Motion for a New Trial or Other Relief." That same day, McCune filed a notice of appeal.

**ISSUES**

¶10.     This Court will consider:

(1) Whether the circuit court erred in denying McCune's motion for change of venue.
(2) Whether the circuit court erred in refusing to grant Instructions D-1, D-5, D-8 and D-11, which would have allowed the jury to consider the lesser-included offense[13] of manslaughter.

**ANALYSIS**

**I.   Whether the circuit court erred in denying McCune's motion for change of venue.**

¶11.     The decision to grant or deny a motion for change of venue is within the discretion of the trial judge. *See **King v. State***, 960 So. 2d 413, 428 (Miss. 2007); ***Mingo v. State***, 944 So. 2d 18, 30 (Miss. 2006). This Court "will not disturb the ruling of the lower court where the trial judge did not *abuse his discretion . . . .*" ***Mingo***, 944 So. 2d at 30 (citing ***Gray v. State***, 799 So. 2d 53, 62 (Miss. 2001)) (emphasis added).

¶12.     In ***King***, this Court noted that it had:

thoroughly addressed the requirements for change of venue in ***Howell*** [***v. State***, 860 So. 2d 704 (Miss. 2004)]:

> The right to a fair trial by an impartial jury is guaranteed by both the federal and state constitutions. ***Johnson*** [***v. State***, 476 So. 2d 1195, 1208 (Miss. 1985)] (citing U.S. Const. Amend. VI and Miss. Const. art. 3, § 26). "The accused has a right to a change of venue when it is doubtful that an impartial jury can be obtained." ***Davis*** [***v. State***, 767 So. 2d 986, 993 (Miss. 2000)] (citing ***White*** [***v. State***, 495 So. 2d 1346, 1348 (Miss. 1986)]). "Upon proper application, there arises a presumption that such

---

[13]Lesser-included offense is a misnomer. The Court considers manslaughter to be a lesser offense of murder.

9

sentiment exists; and, the state then bears the burden of rebutting that presumption." *Johnson*, 476 So. 2d at 1211.

This Court enumerated "certain elements which, when present would serve as an indicator to the trial court as to when the presumption is irrebutable." *White*, 495 So. 2d at 1349. The elements are as follows:

> (1) capital cases based on considerations of a heightened standard of review;
> (2) crowds threatening violence toward the accused;
> (3) an *inordinate amount* of media coverage,[14] particularly in cases of:
>
> > (a) serious crimes against influential families;
> > (b) serious crimes against public officials;
> > (c) serial crimes;
> > (d) crimes committed by a black defendant upon a white victim;
> > (e) where there is an inexperienced trial counsel.

> *Id*.; *Davis*, 767 So. 2d at 993-94 . . . .

*Howell*, 860 So. 2d at 719.

*King*, 960 So. 2d at 429-30 (emphasis added). Furthermore, "the State can rebut the presumption that the defendant could not receive a fair trial by proving that the trial court

---

[14]Additionally:

[i]n cases where there has been pretrial publicity, the trial judge looks at two factors when evaluating the request for a change of venue. *Holland v. State*, 705 So. 2d 307, 336 (Miss. 1997). "First is the level of adverse publicity, both in extent of coverage and its inflammatory nature. Second is the extent of the effect the publicity had upon the venire persons in the case." *Id*.

*Gavin v. State*, 785 So. 2d 1088, 1095 (Miss. Ct. App. 2001).

impaneled an impartial jury." *Id*. at 431 (citing ***Swann v. State***, 806 So. 2d 1111, 1116 (Miss. 2002)).

¶13. McCune's motion for change of venue, with six supporting affidavits attached, created a presumption of doubt that an impartial jury could be obtained.[15] *See **King***, 960 So. 2d at 429. The circuit judge correctly determined that the presumption was rebuttable, as the requisite, irrebutable elements were absent. *See **King***, 960 So. 2d at 429-30. Specifically, this is not a capital case; "[I] heard nothing about the crowds threatening violence[;]"[16] and there was not an "inordinate amount of media coverage."[17] *Id*. The State presented six witnesses to rebut the presumption. Each testified that he or she believed McCune could receive a fair trial in Newton County. Furthermore, during voir dire, numerous venire members indicated that they had read news accounts or had seen television newscasts

---

[15]Only two of the affiants testified at the hearing, i.e., McCune's mother and aunt.

[16]McCune unpersuasively argues that the alleged use of extra security precautions (i.e., law enforcement in and around the courthouse, metal detectors, and limited entryways), not used during the "other trial that took place during the same week of the court term," invalidate the circuit judge's finding. Unfortunately, untoward conduct in courthouses caused by unwelcome societal changes has prompted increased security in many courthouses. This Court rejects the notion that the use of such precautions should be added to the ***White*** elements.

[17]As the circuit judge noted, a single account from The Newton Record was presented at the hearing. He found this pretrial publicity was neither extensive nor inflammatory, and that any effect on the venire could be determined in voir dire. *See **Holland***, 705 So. 2d at 336. Furthermore, the circuit judge found the case *sub judice* to be different from the specific cases in which the "inordinate amount of media coverage" element was of particular concern. ***King***, 960 So. 2d at 429-30 (quoting ***White***, 495 So. 2d at 1349). Specifically, the only testimony as to the applicability of these cases was the testimony of McCune's mother that Bolton's family was more prominent than McCune's. The circuit judge found that testimony to be insufficient. This Court would add that the existence or non-existence of such specific cases is irrelevant in the absence of an "inordinate amount of media coverage" in the first place. *Id*.

regarding the case, and the only one who indicated that she had already formed an opinion as to how the case should be decided was excused.[18] The State's witnesses at the hearing and the voir dire proceedings rebutted any presumption that an impartial jury could not be obtained. *See King*, 960 So. 2d at 429-31. We find nothing in the record of such quality and weight to indicate that the circuit judge abused his discretion in denying McCune's motion for change of venue. *See Mingo*, 944 So. 2d at 30. Accordingly, this Court finds that this issue is without merit.

> **II. Whether the circuit court erred in refusing to grant Instructions D-1, D-5, D-8 and D-11, which would have allowed the jury to consider the lesser offense of manslaughter.**

¶14.    This Court has stated that:

the standard of review for challenges to jury instructions is clear[:]

> [t]he Court does not single out any instruction or take instructions out of context; rather, the instructions are to be read together as a whole. A defendant is entitled to have jury instructions given which present his theory of the case. This entitlement is limited, however, in that the Court is allowed to refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

*Spicer v. State*, 921 So. 2d 292, 313 (Miss. 2006) (citing *Parks v. State*, 884 So. 2d 738, 746 (Miss. 2004)).

With regard to [McCune's] claim that he was entitled to a lesser-included offense instruction, we conduct de novo review, as this is a question of law. *State v. Shaw*, 880 So. 2d 296, 298 (Miss. 2004) (citing *Ostrander v. State*, 803 So. 2d 1172, 1174 (Miss. 2002)).

---

[18]Additionally, all venire members indicated that they had not formed an opinion as to innocence or guilt and could be fair to both McCune and the State.

***Downs v. State***, 962 So. 2d 1255, 1258 (Miss. 2007).  According to ***Strickland v. State***, 2008

Miss. LEXIS 132 (Miss. March 6, 2008), lesser-included-offense instructions:

> should be given if there is an *evidentiary basis* in the record that
> would permit a jury rationally to find the defendant guilty of the
> lesser offense and to acquit him of the greater offense.  ***Welch
> v. State***, 566 So. 2d 680, 684 (Miss. 1990).  In reviewing the
> propriety of such an instruction, we have stated:
>
>> A lesser-included offense instruction should be
>> granted unless the trial judge and ultimately this
>> Court can say, taking the evidence in the light
>> most favorable to the accused and considering all
>> the reasonable inferences which may be drawn in
>> favor of the accused from the evidence, that no
>> reasonable jury could find the defendant guilty of
>> the lesser-included offense (conversely, not guilty
>> of at least one element of the principal charge).
>
> ***McGowan v. State***, 541 So. 2d 1027, 1028 (Miss. 1989).
> However, this Court has repeatedly held that a lesser-included
> offense instruction should not be indiscriminately granted, but
> rather should be submitted to the jury only where there is an
> *evidentiary basis* in the record.  ***Lee v. State***, 469 So. 2d 1225,
> 1230 (Miss. 1985).

***Strickland***, 2008 Miss. LEXIS 132 at *36-37.

¶15.    Manslaughter is defined as "[t]he killing of a human being, without malice, *in the heat*

*of passion*, but in a cruel or unusual manner, or by the use of a dangerous weapon, without

authority of law, *and not in necessary self-defense . . . .*"  Miss. Code Ann. § 97-3-35 (Rev.

2006) (emphasis added).  This Court has defined "heat of passion" as:

> *[a] state of violent and uncontrollable rage engendered by a blow or certain
> other provocation given*, which will reduce a homicide from the grade of
> murder to that of manslaughter.  Passion or anger suddenly aroused at the time
> by some *immediate and reasonable provocation, by words or acts of one at the
> time*.  The term includes an emotional state of mind characterized by anger,
> rage, hatred, furious resentment or terror.

*Agnew v. State*, 783 So. 2d 699, 703 (Miss. 2001) (quoting *Graham v. State*, 582 So. 2d 1014, 1017 (Miss. 1991)) (emphasis added). "[T]here must be such circumstances as would indicate that a normal mind would be roused to the extent that reason is overthrown and passion usurps the mind destroying judgment." *Agnew*, 783 So. 2d at 703-704 (citing *Graham*, 582 So. 2d at 1018).

¶16.    Instruction D-1 provided, in part, that:

> [i]f you find from the evidence in this case beyond a reasonable doubt that [McCune], on or about August 13, 2006, in Newton County, Mississippi, killed J.J. Bolton without malice, in the heat of passion, by the use of a deadly weapon and further that [McCune] was not acting in self-defense, then you shall find [McCune] guilty of manslaughter.[19]

The circuit judge determined that:

> [i]f you're asking for a manslaughter instruction on the basis of passion, not in necessary self-defense, then you cannot turn around and ask for a self-defense instruction. Of course, we're going to argue about the self-defense instruction when we get to it. Here is your instruction that you offered to me, which says killing of a human being without malice or heat of passion but in a cruel or unusual manner or by use of a dangerous weapon without authority of law and not in necessary self-defense. It's refused.

¶17.    This Court agrees with the circuit court's denial of the lesser-offense instructions on manslaughter. A lesser-offense instruction can be refused if it is without foundation in the evidence. *See* **Strickland**, 2008 Miss. LEXIS 132 at *36-37; **Downs**, 962 So. 2d at 1258. Manslaughter must be "in the heat of passion," Miss. Code Ann. § 97-3-35 (Rev. 2006), i.e., the result of "immediate and reasonable provocation, by words or acts of one at the time."

---

[19]Instruction D-5 provided a definition of manslaughter identical to that in Mississippi Code Annotated Section 97-3-35; Instruction D-8 was an excessive force instruction; and Instruction D-11 was a jury verdict instruction as to manslaughter.

14

*Agnew*, 783 So. 2d at 703 (quoting *Graham*, 582 So. 2d at 1017). Hardy testified that prior to the incident Bolton was "talking nice" to McCune. McCune conceded that Bolton did not threaten him that evening, had never made any threat directly to McCune, and he did not see Bolton with a gun that evening. The evidence is devoid of a verbal or physical provocation by Bolton. *See id*. In short, there was no evidentiary basis of provocation of a degree to evoke an uncontrolled response of "anger, rage, hatred, furious resentment or terror." *Id*.

¶18.    Moreover, McCune requested a self-defense instruction, which was granted by the circuit court. McCune testified that the twelve gunshots were fired "out of self-defense." The very definition of manslaughter requires that it is "not in necessary self-defense[.]" Miss. Code Ann. § 97-3-35 (Rev. 2006). Although "[a] criminal defendant has a right to assert alternative theories of defense, even inconsistent alternative theories[,]" *Reddix v. State*, 731 So. 2d 591, 593 (Miss. 1999) (citing *Love v. State*, 441 So. 2d 1353, 1356 (Miss. 1983), there must be an evidentiary basis therefor. That evidentiary basis is lacking.

¶19.    Thus, there was no foundation in the evidence for the lesser-offense instruction. *See Strickland*, 2008 Miss. LEXIS 132 at *36-37; *Downs*, 962 So. 2d at 1258. This Court concludes that the circuit court acted properly in denying such an instruction. This issue likewise is without merit.

### CONCLUSION

¶20.    Accordingly, this Court affirms the final judgment and sentences of the Circuit Court of Newton County.

¶21.    **COUNT I: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF AGGRAVATED**

**ASSAULT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THIS SENTENCE SHALL RUN CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT I HEREOF.**

**SMITH, C.J., WALLER AND DIAZ, P.JJ., EASLEY, CARLSON, DICKINSON AND LAMAR, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY.**