# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00776-COA

**LARMONT DONZELL BURCHETT A/K/A LARMONT D. BURCHETT**      APPELLANT

**v.**

**STATE OF MISSISSIPPI**      APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 05/27/2021 |
| TRIAL JUDGE: | HON. GRADY FRANKLIN TOLLISON III |
| COURT FROM WHICH APPEALED: | MARSHALL COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| | CHARLES MITCHELL McGUFFEY |
| | SPENCER MARK RITCHIE |
| | LARMONT DONZELL BURCHETT (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL: BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY | BEN CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/06/2022 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**McCARTY, J., FOR THE COURT:**

¶1. A factory employee was accused of murdering his co-worker. Despite being identified by other workers as having committed the crime, his theory of defense was that no one saw him do it. The jury found him guilty. On appeal, he argues he should have received a lesser-included instruction on heat of passion manslaughter. Finding there was no evidence to support giving such an instruction and no other issues requiring reversal, we affirm.

## BACKGROUND

¶2.     Larmont Burchett worked in Byhalia at Griffin Inc., where he assembled armored cars. At the time Burchett worked there, the company had about 75 employees, who could turn out 12 to 15 armored vehicles a month. Working close by him was Deandrae Jones. Burchett would do the interior trim work on the vehicles, and Jones would do the exterior.

¶3.     Although he had not worked long at Griffin, Burchett had complained to his supervisor about how Jones treated him at work. Their supervisor, Carlos Young, would later recall that the two were "joking around," but Burchett "didn't take the joke too well." After what he characterized as some teasing and "low jabs," Burchett went to his supervisor and told him "that he didn't want to . . . continue to joke" with Jones.

¶4.     The supervisor told them to knock it off, and according to him "both of them said that there wouldn't be anymore joking around with each other." The two then "shook hands," and there did not seem to be any more trouble.

¶5.     But on another day, something else happened. The supervisor would "normally get with every employee early in the morning" to explain what was needed for the day. But Burchett was not ready for work; instead, he was "just sitting like—he was just sitting dazed," his supervisor would later remember.

¶6.     The supervisor asked him if he was okay, and Burchett said he was fine. Shortly thereafter though he said, "[M]an I'm feeling bad. I'm feeling sick at my stomach." The supervisor called his immediate superior, who told him to let Burchett go to the doctor if he did not feel well. So the supervisor gave Burchett permission to leave, and the worker agreed

he was going to the doctor. Young reminded Burchett that since he had not been working at the plant longer than 90 days that he would need an excuse from his doctor. Burchett asked if taking off sick would "count against" him, and the supervisor said no. Young recalled telling him "Go get yourself taken care of and hopefully we'll see you tomorrow."

¶7. And then Young said Burchett "clocked out and went to his vehicle." But Burchett didn't leave.

¶8. Less than five minutes later, the supervisor was stocking bins with nuts and bolts for the workers when he "heard three shots." Then he heard an "employee scream 'Man, who shooting firecrackers in here[?]'" But it wasn't firecrackers—instead, the supervisor saw Burchett shooting a gun. Because he thought Burchett was shooting at him, he ran and "jumped behind the stairway and laid there until it was over with." From his vantage point he saw Burchett, who had moved his Jeep closer to the exit, get in and drive off.

¶9. It was after the shooting finally stopped when the supervisor learned Jones had been shot multiple times. He would later die from the gunshot wounds.

¶10. Law enforcement later found Burchett some 30 miles away in Memphis, after the company that had financed the Jeep shared its location. He was arrested and later indicted for the deliberate-design first-degree murder of Jones.

## PROCEDURAL HISTORY

¶11. Before trial, Burchett indicated to the trial court that he wished to proceed without counsel. The trial court ultimately determined that he could proceed as he desired but left his appointed lawyer in a hybrid capacity. Burchett's counsel announced to the jury during

3

opening statement that the theory of defense was "that there is a lot of gray here." According to the defense, the jury would not hear the State's witnesses say that "they were there" when Jones was shot or "that they saw the gun" or "that they saw [the shooting]."

¶12. Defense counsel was certain that "the one thing you won't hear from any of the . . . witnesses or from the law enforcement is [']I was there, I was standing there, I saw Larmont shoot Deandrae Jones.[']"

¶13. But the jury then heard testimony from two witnesses that they saw Larmont Burchett shoot Deandrae Jones.

¶14. First was Samuel Klaus, who delivered parts to various sections of the plant. In his words, he "was delivering parts to that building and then Larmont came around . . . and shot Deandrae and then took off to his Jeep and got away." When pressed repeatedly about details, Klaus was steadfast that he saw Burchett shoot Jones with a handgun: "No doubt about it." On cross-examination, when defense counsel pressed if he could be mistaken about the identity of the shooter, Klaus testified that he was sure—"No one looked like him at all."

¶15. The jury also heard from Jekiah Walton, who worked in quality control. That morning he explained he had seen "Larmont and Deandrae into it"—well, more like "[n]ot into it, but they [were] close to each other like talking to each other," even though "they weren't loud." He thought they should "chill out, whatever."

¶16. According to Walton, he saw Burchett walk out of his area and ask where their supervisor was. Walton then witnessed Burchett asking Young for permission to leave work

4

since he did not feel well. But he remembered being surprised when Burchett not only did not leave, but came back inside the plant: "like I'll say about five minutes later," when he thought, "I thought you were gone . . . I'd be gone in a minute."

¶17. Walton then told the jury that Burchett "was walking around the truck where Deandrae was and shot him." He saw the gun in his hand because "I was standing behind him," and he "count[ed] about seven, seven shots."

¶18. The witness also did not understand what had caused the conflict. Even though people joked around at the plant—"We kept calling and checking each other"—there was nothing so serious it would provoke violence. "[I]t was just joking to me."

¶19. The State asked Walton about Burchett's return to work after leaving that morning: "did he seem calm to you?" Walton responded, "Yeah" and that he just "thought [Burchett] had left his jacket or something." And after Burchett shot Jones, the witness testified, Burchett just "stepped over him and walked out." He then "[w]alked out to his truck he had parked beside the bay . . . and drove off."

¶20. Next, the jury heard from Burchett and Jones' supervisor, Young. He explained the two men worked close by and had a verbal dispute in the past, and that he had issued them an ultimatum. Critically, Young also explained that after he let Burchett leave to go to the doctor, he believed the worker had moved his Jeep from the general parking lot for employees up closer to the building. He noticed this only "after the shooting had taken place" but testified that his Jeep was not parked as closely when he allowed him to go to the doctor.

5

¶21.   The father of the victim testified, as did two other plant employees who responded to the shooting but did not directly witness it.  First was human resources employee Tassie Cox, who had previously been an EMT.  Young had radioed her "and just told me to come to the trim shop [because] there had been a shooting."  Jones was "bleeding from the head" when she arrived, and she "tr[ied] to help him best I could."  She saw a gunshot wound to his head, and "two on the front and then there was one on the back."  She stayed with the victim until a helicopter arrived to transport him away.

¶22.   Alongside her was Julio Gonzalez, a maintenance technician who, like Cox, had emergency training—as a U.S. Marine.  He heard a series of "pops" and then went to check on what it was.  He found Jones "riddled" with gunshots, and along with Cox tried to administer first aid.  On his way into the building, Gonzalez saw Burchett leaving.  He "just walked out" according to the witness.

¶23.   An investigator from the Marshall County Sheriff's Department testified, and the jury was played the audio of an interview he made with Burchett after the defendant had been picked up in Memphis.  Burchett had at first been read his *Miranda* rights.  According to Burchett, he had only worked at the plant for about a month.  He had been teased and teased back, but he believed Jones had become more "aggressive" in his teasing.  This led to the dispute recounted by the supervisor.  While Burchett thought this would conclude the teasing, he said Jones "will be coming by and kick my tools over."

¶24.   The day of the shooting, according to Burchett, "was a typical morning." But Jones then bumped into him, and while the statement is rather disjointed, according to Burchett the

6

victim may have also kicked his bag. The witness explained he first went outside to calm down. After this Burchett asked his supervisor if he could leave. As the narrative continued, Burchett began to decline to answer questions. The deputy ceased his questioning, and the tape concluded.

¶25. The defense rested without calling witnesses or offering evidence.

¶26. During the jury instruction conference, the defense offered a lengthy instruction that included the elements of deliberate design murder. This instruction, D13, would have instructed the jury that if it did not find beyond a reasonable doubt that Burchett committed all the elements of deliberate design murder, it "must continue [its] deliberations to determine whether the defendant has committed the lesser crime of Manslaughter." The proposed instruction would have told the jury that if they found "the defendant acted lawfully [sic], willfully and feloniously, but without malice and in the heat of passion," then it could return the verdict of manslaughter.

¶27. The State objected, arguing that "based on what we've heard throughout this trial," the defense could not "articulate any scenario where . . . heat of passion was triggered."

¶28. The defense countered that "it's been said by several witnesses that there was an altercation of sorts or an argument between the parties, the victim and Larmont, and possibly others, but it was after that the shooting occurred shortly thereafter." For this reason, the defense argued that "this is a necessary and justified less[e]r-included offense instruction."

¶29. In rebuttal, the State relied on precedent that heat of passion required "an emotional state of mind characterized by . . . anger, rage, hatred, furious resentment or terror." And that

7

the evidence showed only "[m]ere words no physical altercation at all" and that indeed there were "certain deliberate actions" after the alleged dispute—including Burchett first sitting down in the armored truck, speaking to his supervisor, claiming sickness, agreeing to go see a doctor, leaving, and then returning, which some witnesses remembered as around a five-minute period. Given these facts, the State argued there was no "fact in this case that we've heard that would justify . . . the manslaughter instructions."

¶30. The trial court agreed and declined to give the instruction, determining that "after hearing the evidence, I don't believe there's an evidentiary basis to include D13[,] the lesser-included offense" instruction.

¶31. The jury subsequently found Burchett guilty of deliberate-design murder.

## DISCUSSION

I.     **The heat of passion manslaughter instruction was properly rejected.**

¶32. The sole issue on appeal raised by appointed counsel is that the trial court erred by refusing the heat of passion manslaughter instruction.

¶33. "When reviewing a trial court's grant or denial of a jury instruction, this Court considers the jury instructions as a whole to determine if the jury was properly instructed, giving abuse-of-discretion deference to the trial judge's decision." *Clayton v. State*, 106 So. 3d 802, 804 (¶5) (Miss. 2012) (internal quotation marks omitted). This discretion is not unfettered, as "in homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuses that are supported by the evidence, *no matter how meager or unlikely*, and the trial court's failure to do so is error requiring reversal of a

8

judgment of conviction." *Id*. at 806 (¶10) (alteration omitted) (emphasis in original).

¶34.    While a "defendant is entitled to have jury instructions given which present his theory of the case," a trial court is not required to give an instruction simply because a defendant requests it. *Id*. at 804 (¶6). "[T]his entitlement is limited in that the court may refuse an instruction which [1] incorrectly states the law, [2] is covered fairly elsewhere in the instructions, or [3] is without foundation in the evidence." *Id*. (alterations in original).

¶35.    In this case, counsel for the defendant sought an instruction on heat of passion manslaughter, arguing that it was a lesser-included offense. As with all instructions, "[a] lesser-offense instruction can be refused if it is without foundation in the evidence." *McCune v. State*, 989 So. 2d 310, 319 (¶17) (Miss. 2008). Our precedent has established what first must be present to warrant the instruction. In general, the defendant would have had to be in a "state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter." *Id*. at 319 (¶15) (emphasis omitted). "Passion or anger [must be] suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time." *Id*. (emphasis omitted). Heat of passion "includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror." *Id*.

¶36.    We have also explained what heat of passion is *not*. "[W]ords alone and disagreements among people are not enough to invoke the passion required for this defense." *Baker v. State*, 304 So. 3d 707, 712 (¶17) (Miss. Ct. App. 2020). "Mere words, no matter how provocative, are insufficient to reduce an intentional and unjustifiable homicide from

murder to manslaughter." *Id.*

¶37. This standard for heat of passion is not subjective. It is a reasonable-person standard. *Abeyta v. State*, 137 So. 3d 305, 310 (¶10) (Miss. 2014). "That the accused subjectively experienced passion and anger is not enough to reduce a killing to manslaughter." *Id.* "Rather, the impassioned reaction of the accused must have been reasonable: the passion felt by the person committing the act should be superinduced by some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation." *Id.* "There must be such circumstances as would indicate that a normal mind would be roused to the extent that reason is overthrown and passion usurps the mind destroying judgment." *Id.* at 310-11 (¶10) (alteration omitted).

¶38. In this case, the defendant did not take the stand, as was his right, so the only evidence that might have been adduced to support his request for a lesser-included instruction was from the State's witnesses and his statement taken after the shooting. The jury heard that Burchett had only worked at the plant for about a month, that he had been teased by some of the other workers, and that he went to his supervisor to request the teasing stop.

¶39. One witness, Walton, described seeing Burchett in a dispute with Jones the day of the shooting, but then noted how they "weren't loud," even if they seemed angry. Burchett had asked his supervisor for permission to leave after this event, and permission had been granted. He then actually left the plant floor.

¶40. The jury also heard the recorded statement made by Burchett to law enforcement. Even if the statement by Burchett was credible, which was for the jury to weigh, at the very

10

worst he recounted how Jones had teased him, possibly kicked his toolbox, and that morning had bumped into him. Under our precedent, despite that Burchett may have had his feelings hurt by the teasing or being bumped by his co-worker, the evidence did not come close to supporting an instruction for heat-of-passion manslaughter.

¶41. Indeed, the jury heard the opposite—of a person who requested to leave work, did so, and then according to the supervisor, moved his Jeep up closer to the plant. He then came back inside and shot a man over and over again. According to one witness, Walton, the defendant was so calm walking back in that he thought he had merely left his jacket. Notably, two witnesses—both supervisor Young and maintenance technician Gonzalez—also described Burchett as calm when he left the plant after shooting Jones. Burchett was described by both as simply walking away.

¶42. There was no proof in this trial that Burchett was induced into "an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror." *Abeyta*, 137 So. 3d at 310-11 (¶10). The only proof was of minor occurrences or inconveniences that do not reach the point where "a normal mind would be roused to the extent that reason is overthrown and passion usurps the mind destroying judgment." *Id*. at 311. As a result, the trial court did not abuse its discretion in declining the jury instruction.

## II. Burchett's pro se issues are without merit.

¶43. Burchett filed his own pro se brief which contained several complaints, all of which are confined to the arena of procedure and do not attack the substantive eyewitness proof introduced at trial.

11

¶44. The first is that the State did not "establish 'probable cause' to (indict) or bind Appellant until trial." There are also some general protests that evidence was somehow fabricated, ignoring the testimony of multiple witnesses who saw Burchett shoot Jones multiple times.

¶45. We have rejected arguments of this type before. "An indictment by a grand jury is a determination that probable cause does exist to hold the person indicted for trial." *Griffin v. State*, 824 So. 2d 632, 635 (¶4) (Miss. Ct. App. 2002). In that case, we ruled "[t]his issue is without merit because the grand jury indicted [the defendant] thus establishing probable cause." *Id*. The same rule is true in this case.

¶46. Next, Burchett protests that "to conceal the prejudice of the County, the State illegally Wa[ived] [his] arraignment." Our rules generally require arraignment, which "shall be held within thirty (30) days after the defendant is served with the indictment." MRCrP 15.1(a). However, there is a notable exception: "A defendant need not be present for the arraignment if the defendant, in a written waiver signed by both the defendant and the defendant's attorney, has waived appearance and has affirmed that the defendant received a copy of the indictment and that the plea is not guilty." MRCrP 15.6(d).

¶47. In its response, the State points to the record, which contains a waiver of arraignment which complies with Rule 15.1. The waiver was signed by both Burchett and his counsel, combined with an entry of a plea of not guilty, and sets out that the defendant "acknowledges service of a copy of the Indictment[.]" This claim has no merit.

¶48. Third, Burchett claims a *Brady* violation—specifically, that he was not provided

"audio/video evidence" he requested, again referring to "the forgery of material evidence." It is long settled that "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Mohamed v. State*, 323 So. 3d 532, 550 (¶55) (Miss. Ct. App. 2021) (internal quotation marks omitted). To establish such a violation, a defendant "must meet all four prongs" of a test set by our Supreme Court:

> The defendant must prove: (a) that the State possessed evidence favorable to the defendant (including impeachment evidence); (b) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (c) that the prosecution suppressed the favorable evidence; and (d) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*Id*. (citation omitted).

¶49.    In this case, there is no proof that the State possessed any evidence favorable to the defendant. Instead, the transcript of pretrial matters reveals that while Burchett may not have known the entire contents of discovery, it had been turned over to his counsel. There was also no showing that this hypothetical evidence would have been exculpatory. Burchett's theory of the case at trial was that there was no proof of him committing the crime; nonetheless, two witnesses testified they had seen him shooting Jones. Others had seen him with a gun or calmly leaving the scene. To the extent there was any evidence tending to favor Burchett, it was the audio recording of his interview with law enforcement where he told his version of how he thought Jones was picking on him at work. This was played for the jury. This claim of error is utterly without merit.

13

¶50. Burchett last complains about "the unjust denial of the Appellant to proceed pro se." "A defendant's right to represent himself at trial is a constitutional guarantee, so this Court will review alleged violations of a defendant's right to self-representation de novo." *Ford v. State*, 333 So. 3d 896, 908 (¶25) (Miss. Ct. App. 2022). Under our rules, "[w]hen the court learns that a defendant desires to act as his/her own attorney, the court shall conduct an on-the-record examination of the defendant to determine if the defendant knowingly and voluntarily desires to act as his/her own attorney." MRCrP 7.1(c) (setting out a checklist of five items to review with the defendant).

¶51. Once informed by Burchett that he wished to proceed pro se, the trial court followed the requirements of Rule 7.1. The rule also contains a provision that "the court may appoint an attorney to assist the defendant on procedure and protocol, even if the defendant does not desire an attorney." MRCrP 7.1(c). In this case, the trial court instructed Burchett's previously-appointed lawyer to assist him via hybrid representation. "[H]ybrid representation is the participation by an attorney in the conduct of the trial when the defendant is proceeding pro se," and does not violate the defendant's right to proceed pro se. *Walker v. State*, 340 So. 3d 335, 363 (¶93) (Miss. Ct. App. 2021). We find the trial court appropriately granted Burchett the right to represent himself, with hybrid representation, after following the requirements of the rule and making the required findings. Therefore this claim is rejected as without merit.

## CONCLUSION

¶52. A heat-of-passion-manslaughter instruction was not warranted by the proof in this

case, so the trial court was within its discretion to refuse it. Additionally, the pro se issues argued by Burchett are also rejected. Therefore we affirm the conviction.

¶53. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY McDONALD, J.**

**WESTBROOKS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶54. I agree with the majority's finding that Burchett's pro se issues are without merit. However, I do not agree with the majority that the trial court properly rejected Burchett's lesser-included jury instruction for manslaughter in this case. Therefore, I concur in part and respectfully dissent in part from the majority's opinion.

¶55. On February 20, 2017, Deandrae Jones was tragically shot and killed at his place of employment. After eyewitnesses identified Larmont Burchett as the shooter, he was arrested in Memphis, Tennessee, later the same day. At trial, Burchett was permitted to represent himself while Attorney Lori Shaw continued to assist Burchett in an advisory role. During trial, Burchett presented evidence of an altercation with Jones that took place in the morning prior to the shooting. Burchett presented evidence that Jones bumped into him, and possibly kicked over a bag of his tools that morning. This kind of "aggressive" teasing had been ongoing and had previously resulted in a meeting with their supervisor, Carlos Young, where both Jones and Burchett were told their jobs were in jeopardy if the "joking around" did not stop. The altercation that morning was corroborated by witness Jekiah Walton, who

15

observed Burchett and Jones in a tense situation before the shooting. Walton did not know the context of their discussion, but he knew things were wrong because "they [were] close to each other like talking to each other, . . . but I knew things really weren't just. And I'm like, 'Chill out, chill out . . . .'" Young also commented on Burchett's demeanor after the incident that morning, stating that although Burchett told Young he was "fine," Burchett "was just sitting like - he was just sitting dazed like he was in a daze." The record is unclear exactly how much time elapsed between the altercation and the shooting, although all of the events were said to have happened during the morning.

¶56.    At the close of trial, Burchett, through Shaw, attempted to introduce the lessor-included-offense instruction for manslaughter based on the evidence of this altercation between the parties. The trial court stated that "under Mississippi law a defendant has a right to a lesser-included instruction if there is evidence. But after hearing the evidence, I don't believe there's an evidentiary basis to include [the jury instruction for] the lesser-included offense. So that . . . will be refused." I believe this determination by the trial court was in error.

¶57.    While it is true that a review of a trial court's decision to give or refuse a jury instruction is typically reviewed for abuse of discretion, the Supreme Court has stated that "[w]e review a trial judge's denial of a lesser-included-offense jury instruction de novo." *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013) (citing *Downs v. State*, 962 So. 2d 1255, 1258 (¶10) (Miss. 2007)); *see also Taylor v. State*, 291 So. 3d 14, 19 (¶15) (Miss. Ct. App. 2019). This means this Court can determine on its own whether the instruction was

16

refused for the proper reasons, i.e., it "incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Gilmore*, 119 So. 3d at 286 (¶13).

¶58. Manslaughter is defined by statute as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense . . . ." Miss. Code Ann. § 97-3-35 (Rev. 2014). "'Heat of passion' refers to a 'state of violent and uncontrollable rage engendered by a blow or certain other provocation given,' but the passion must be the result of 'immediate and reasonable provocation' arising from words or acts of the victim." *Hogan v. State*, 89 So. 3d 36, 40 (¶17) (Miss. Ct. App. 2011) (quoting *Turner v. State*, 773 So. 2d 952, 953 (¶5) (Miss. Ct. App. 2000)). The conflict that leads to the manslaughter can be prolonged over a period of time, and as a result of escalating arguments. *See Dedeaux v. State*, 630 So. 2d 30, 31-33 (Miss. 1993) (reversing and remanding for resentencing for manslaughter instead of murder after a prolonged fight at a juke joint led to Dedeaux retrieving gun from car trunk and shooting the man he was fighting); *Clemons v. State*, 473 So. 2d 943, 943-45 (Miss. 1985) (reversing and remanding for resentencing for manslaughter instead of murder after two fights in a café and then a third fight some distance away led to Clemons stabbing the man he was fighting).

¶59. "Whether a homicide is classified as a murder or manslaughter is ordinarily an inquiry to be made by the jury." *Adams v. State*, 291 So. 3d 405, 409-10 (¶14) (Miss. Ct. App. 2020) (citing *Moore v. State*, 52 So. 3d 339, 347 (¶32) (Miss. 2010)). "A party has the right to have

his theory of the case presented to the jury by instructions, provided that there is credible evidence that supports that theory." *McGee v. State*, 820 So. 2d 700, 705 (¶9) (Miss. Ct. App. 2000) (citing *Alley v. Praschak Mach. Co.*, 366 So. 2d 661, 665 (Miss. 1979)). Even so, "such an instruction should not be indiscriminately or automatically given." *Agnew v. State*, 783 So. 2d 699, 703 (¶11) (Miss. 2001) (citing *Mease v. State*, 539 So. 2d 1324, 1329 (Miss. 1989)). "Such an instruction 'should only be given after the trial court has carefully considered the evidence and is of the opinion that such an instruction is justified by the evidence." *Id*.

¶60.  The Supreme Court has outlined a test to determine whether a lesser-included-offense instruction should be submitted to the jury:

> A lesser included offense instruction should be granted unless the trial judge—and ultimately this Court—can say, taking the evidence in the light most favorable to [the accused] and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser included offense (and conversely not guilty of at least one essential element of the principal charge).

*Id*. at (¶10) (citing *Graham v. State*, 582 So. 2d 1014, 1017 (Miss. 1991)). Furthermore, "[o]ur case law leans heavily in favor of instructing the jury on a lesser-included offense." *Id*. at (¶11). "As recently as 1997, we reaffirmed that the jury should be given the option of a lesser-included offense where there is *any* evidentiary basis." *Id*. (citing *Russell v. State*, 729 So. 2d 781, 787 (Miss. 1997)). "Even though based on meager evidence and highly unlikely, a defendant is entitled to have every legal defense he asserts to be submitted as a factual issue for determination by the jury under proper instruction of the court." *Hester v.*

*State*, 602 So. 2d 869, 872 (Miss. 1992). "Where a defendant's proffered instruction has an evidentiary basis, properly states the law, and is the only instruction presenting his theory of the case, refusal to grant it constitutes reversible error." *Id*. (citing *Murphy v. State*, 566 So. 2d 1201, 1207 (Miss. 1990)).

¶61.    In the present case, Burchett presented some evidence of an altercation that took place prior to the shooting. He described a physical interaction, and some part of the altercation was witnessed and corroborated by Walton. Young described Burchett as appearing to be "in a daze" prior to the incident. Although the exact timeline of the morning is unclear, all testimony refers to events that occurred in that morning. If this evidence is taken "in the light most favorable to the accused," and "all reasonable favorable inferences" are considered, it is possible that a reasonable jury could find that Burchett committed manslaughter instead of murder. *Agnew*, 783 So. 2d at 703 (¶10). If there is any doubt over whether a reasonable jury could find the manslaughter charge appropriate, our case law "leans heavily in favor" of permitting the instruction. *Id*. at (¶11). I believe that to disregard evidence that points to manslaughter, however meager, and to dismiss the instruction is to invade the province of the jury and should be considered error.

¶62.    In conclusion, Burchett provided some evidence of an altercation that had a physical component that strongly affected his state of mind. This altercation was corroborated by a witness. Given this evidence, the jury should have been given the opportunity to consider the lesser-included offense of manslaughter in Burchett's case. Accordingly, I respectfully dissent on this issue alone.

19

**McDONALD, J., JOINS THIS OPINION IN PART.**