# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00881-COA

**MARKEVIOUS BANKS A/K/A WEBO**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/18/2024 |
| TRIAL JUDGE: | HON. WILLIAM HUNTER NOWELL |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: STACY L. FERRARO W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JULIANNE KAY BAILEY |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/27/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**McCARTY, J., FOR THE COURT:**

¶1.    A teenage boy got into an argument with his uncle while at a family gathering. Their argument escalated to gunfire, and the uncle was killed. The teenager was indicted for manslaughter with a firearm enhancement. After a jury trial, he was found guilty. On appeal, he raises only one issue, arguing that the jury's verdict was against the overwhelming weight of the evidence. Finding no error, we affirm.

## FACTS

¶2.    One evening in May 2023, the Banks family gathered at the home of Elizabeth Moore

for a night consisting of card games and fellowship. At some point that night, an argument occurred. Fifteen-year-old Markevious "Webo" Banks was arguing with his grandmother. His 36-year-old uncle, Devonski Banks, sharply criticized the way the teenager spoke to her. During the exchange, the teenage boy's aunt, mother, and grandmother were all present.

¶3. After hearing the argument escalate while tucking her young grandchildren into bed, Moore called 911 to report the "verbal arguing." Moore further requested the removal of an "unwanted guest."

¶4. Markevious, his mother, and his grandmother were then ordered outside by Moore in an attempt to defuse the situation. The group complied and stood outside on the lawn. Not long after, Devonski told Moore that he needed to go retrieve something from his vehicle. Despite pleas from Moore not to leave the house, Devonski left and made his way to his vehicle. Then, he allegedly retrieved a 9mm handgun and walked towards his nephew.

¶5. While accounts varied on what happened next, the two struggled. Markevious gained control of the gun and fired four shots. Devonski stumbled back into the home, stating, "Webo shot me." Almost immediately afterward, he collapsed in the doorway. He later died due to the extent of his injuries.

¶6. By the time police arrived on the scene, Markevious was gone. Law enforcement was unable to locate the teenager until he turned himself in.

¶7. Markevious was arrested and later indicted for manslaughter with an accompanying firearm enhancement.

2

## PROCEDURAL HISTORY

¶8.     At trial, the State called multiple witnesses. Corporal Glenn Daniels of the Boliver County Sheriff's Department testified first. The officer testified that he was the initial responding officer originally dispatched to the Moore home for a "disturbance call." He disclosed that when he was one block away from the home, he "heard gunshots, about three of them."

¶9.     As the officer "got closer" to the street of the incident, he observed a "medium size male" running away from the home. After arriving at the scene, Daniels was informed Devonski had been shot and called for an ambulance. Upon entry of the home, Daniels observed a "male subject laying on the floor." He explained to the jury that the man "appeared" to have an injury near the "stomach area." Daniels did not see a gun or Markevious at the scene.

¶10.    Elizabeth Moore testified for the State next. Moore testified that on the night of the shooting she invited family over to play cards and visit. She was Markevious' aunt, and she explained "everything was just fine" until she went to put her grandbaby to sleep in the back room. Moore testified that was when she "heard the commotion," which sounded "like arguing and stuff." She told the jury that she observed her sister and the teenager's mother arguing, and in an attempt to "defuse the situation," she told them to "just leave." But her attempts to ease the tension fell short, and Moore disclosed that she "called 911" because she had "unwanted guests."

¶11. She stated that following her call to 911, the teenager's mother and her sister "got up and left." When asked whether she observed Markevious in the home, Moore testified that she "didn't see him at all." Then, after a few moments, Devonski said he had "to go outside," and Moore pleaded with him not to go.

¶12. Despite her efforts, Moore disclosed that Devonski went outside and seemed "kind of upset" about the argument that had just occurred between him and Markevious. Moore explained to the jury that after Devonski went outside, she "heard the gunshot," and then she "heard two or three more," explaining "that's when Devonski ran in the house" and "he collapsed."

¶13. On cross-examination, Moore admitted she was not looking out her window to see what occurred during Markevious and Devonski's altercation.

¶14. Investigator Cordell Daniels of the Bolivar County Sheriff's Department also testified for the State. The investigator testified that he recovered three shell casings at the crime scene under the streetlight in front of the home. He further testified that he submitted the shell casings to the crime lab "to see [if] they c[a]me back to any other shootings." When asked whether he was able to locate a gun at the scene of the incident, the investigator answered, "We looked, but we were unable to locate one." He explained to the jury that because the victim had "a trach down his throat" and had been receiving constant medical attention at a hospital in Memphis, he was unable to speak to him. The investigator testified that he was notified a few days later that Devonski had passed away and was referred for an

4

autopsy. He further testified that Markevious turned himself in "two days after" but disclosed they did not test his hands or clothing for gunshot residue because "by that time, he'd bathed and took a shower and wash[ed] his hands and changed clothes."

¶ 15.    The jury heard the investigator testify that the teenager had no visible injuries.

[State]:      In what you were able to observe of him, were you able to see his neck, his face?

[Daniels]:   Yeah. When I took him in to read him his rights.

[State]:      Okay. Did you observe any injuries to his neck or face?

[Daniels]:   No, ma'am.

[State]:      What — what you could see of him, that wasn't clothed, could you observe any injuries at all?

[Daniels]:   No, ma'am.

¶16.    The defendant's great aunt Teretha Banks testified for the State next. Teretha told the jury that "Markevious got mad at his grandmother," Helen Banks, over "some money." She further testified that "Devonski got mad" and corrected the teenager's tone, claiming Markevious was "not going to talk to [her] mom like that." According to Teretha, Markevious "got in a rage" and "pulled a gun" because of this argument, which scared all the kids in the home. She explained to the jury that "Markevious cocked the gun," but then his mother grabbed him.

¶17.    Teretha described the gun as a tan pistol that Markevious retrieved from his backpack. She further explained that she and her sister, LaShondra, argued over whether the gun was

actually a gun or Markevious' phone, as her sister claimed. But Teretha was adamant it was not a phone, recounting that while her family members attempted to get Markevious out of the home, the gun fell, and she was able to get a look at it.

¶18. After Markevious, his mother, and grandmother all went outside, Teretha testifed that Devonski followed shortly after. When asked whether she saw Devonski with a gun, Teretha replied, "No." When asked if she ever looked outside, Teretha replied, "No ma'am." She recounted that she heard arguing and gunshots and then observed Devonski come into the home "looking strange." Teretha disclosed that she asked Devonski "what was wrong," and he told her, "Webo shot me," and then fell to the floor.

¶19. The State's final witness was Dr. Frank Peretti, a forensic pathologist for the Mississippi Forensics Laboratory. He was accepted as an expert in the field of forensic pathology by the trial court. Dr. Peretti testified that Devonski had 2 gunshot wounds. He described that one of Devonski's wounds had a visible entrance wound on the lower back and an exit wound to the left side of his chest. He recounted an additional wound to the left arm's tricep region, where a "large caliber jacket bullet" was recovered.

¶20. Dr. Peretti testified that Devonski "had extensive medical intervention," detailing for the jury that he developed "multi-system organ failure, complicating gunshot wounds to the back and left arm." Dr. Peretti concluded that Devonski's manner of death was homicide.

¶21. Disclosing that part of the autopsy requires gunshot wounds to be classified, Dr. Peretti explained to the jury the different classification of gunshot wounds. He explained that

a gunshot wound can be classified as tight, intermediate, or distant. Dr. Peretti testified that he classified Devonski's wounds as distance wounds since he observed no stippling or burning of the skin. Dr. Peretti added that this generally requires a distance of "greater than 2 feet."

¶22. After the State rested its case-in-chief, the defense moved for a directed verdict, arguing "that the State has failed to put forward a prima facie case that Markevious Banks willfully and feloniously . . . acted in the heat of passion, [and] shot Devonski Banks[.]" The trial court denied the motion.

¶23. The defense called its first witness, LaShondra Banks, the teenager's mother. LaShondra testified that Markevious and her mother were "talking about the car" on the evening of the shooting. According to LaShondra, "Devonski thought they [were] arguing," got upset, and started talking about "what he was going to do to Markevious." She told the jury that Moore asked Markevious to leave after he and Devonski "started arguing so loud."

¶24. LaShondra testified that Devonski was "hooting and hollering and cussing." After leaving the house, LaShondra disclosed that she, her mother, and Markevious were standing outside by her car. She detailed to the jury how Devonski "went to his truck first," got a black gun, "put it in the air," and "went to shooting." At this point, Devonski "grabbed Markevious around his neck and . . . dragged him back down the road, with the gun to his head."

¶25. On cross-examination, when asked whether she saw the shooting, LaShondra answered, "No." When asked whether she observed her son's actions at the time Devonski

7

was shot, she also answered, "No."

¶26.    Booker Reese, the teenager's stepfather, took the stand next. He testified that he was not present during the argument inside the home because he was at a neighbor's trailer "around the corner." Reese disclosed that when he was coming back from the neighbor's house, he "hear[d] the commotion" and "walked up on Devonski" holding "Markevious around the neck with a gun to his head." Reese testified that he did not see Devonski get shot. When asked whether he knew if Markevious acted in self-defense, Reese answered, "No. I don't — I don't know what happened after [Devonski] was shot. I ran."

¶27.    Then Helen Banks testified. She explained that Markevious was her grandson and that Devonski was her son. Helen disclosed that on the night of the shooting, she and "Markevious [were] having a conversation about [her] white car." According to Helen, Devonski "thought we were arguing" and "jumped up and went to screaming and hollering at Markevious." After Moore asked the "boys" to "take that out," Helen told the jury that Markevious and his mother stood outside for "about an hour." During that time, she explained how Devonski went to the back of his truck and "c[a]me out with a gun." She further testified that Devonski "grabbed Markevious," began "throwing him around," and "dragged him up and down the road . . . with the gun to his head." Helen confirmed that she did not see Devonski get shot in the back, nor could she explain how Markevious got a hold of Devonski's gun.

¶28.    Finally, Markevious Banks took the stand in his own defense. He recounted to the jury

the conversation he had with his grandmother about wanting to sell his current car for something faster. As a result of this conversation, he explained how his uncle "jumped up" and started "talking out of his mouth." Further explaining that Devonski was both older and larger than him, Markevious testified his uncle yelled about "what he'[d] do to me." Markevious explained that he was standing outside when Devonski "came outside" and went to his truck. At this point Markevious testified that he "thought everything was straight," but when he "looked back over, [Devonski] was coming towards me." He further testified that Devonski retrieved a gun and "got to shooting in the air" about "three or four times" before reaching him. Then Markevious told the jury how Devonski "grabbed [him] around [his] neck and started choking [him]." Markevious testified that Devonski "put the gun to [his] head" and "dragged [him] down the street." Markevious said he struggled for the weapon and "snagged the gun and fired [it] two times to get [Devonski] off of me."

¶29.    Markevious testified multiple times that even though he shot the gun, he "[didn't] know where [he] was shooting." He further disclosed that once he "got the gun in [his] hands," he "just shot two times to get [Devonski] off of me," but Markevious did not realize Devonski had actually been struck by the bullets.

¶30.    During cross-examination, when asked whether he had gotten away from Devonski when he fired the gun, Markevious replied, "No ma'am. He was still choking me." Attempting to clarify Markevious' statement, the State asked whether Devonski was still choking him when Markevious shot his uncle in the back. Markevious replied, "Yes ma'am."

9

¶31. Markevious testified that he "was scared" when officers arrived on scene, so he "took off running." He disclosed that he thought he "threw the gun" while running but [didn't] even remember." He recounted for the jury that he laid in a nearby open field until the next morning, when he tried to "[find] a ride to the hospital" to see Devonski. Markevious further disclosed that he was advised not to go to the hospital. He then turned himself in to law enforcement.

¶32. At the conclusion of the trial, the jury ultimately found Markevious Banks guilty of manslaughter and the accompanying firearm enhancement. He was sentenced to serve 20 years in the custody of the Mississippi Department of Corrections and an additional 5 years for the firearm enhancement, set to run consecutively to one another. Banks then appealed.

## DISCUSSION

**The verdict was not against the overwhelming weight of the evidence.**

¶33. On appeal, Banks argues "the State . . . offered no consequential nor conclusive evidence" to support the verdict of manslaughter. Specifically, he argues that "not only did the overwhelming weight of evidence favor [him]" but that the jury's verdict was "unconscionable."

¶34. "The trial court's grant or denial of a new trial is reviewed under an abuse of discretion standard, and the evidence is viewed in the light most favorable to the verdict." *Jordan v. State*, 413 So. 3d 611, 616 (¶26) (Miss. Ct. App. 2025) (citing *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017)). "We will not order a new trial unless convinced that the

10

verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." *Id.* (quoting *Jones v. State*, 390 So. 3d 498, 503 (¶20) (Miss. 2024)).

¶35.    Mississippi law defines heat-of-passion manslaughter as "the killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense[.]" Miss. Code Ann. § 97-3-35 (Rev. 2020). Notably, manslaughter is not a crime of specific intent. *Id.*

¶36.    At trial, the forensic pathologist testified that the victim suffered from two gunshot wounds. The first was an apparent entrance wound on the lower back corresponding with an exit wound on the left side of his chest. The second wound contained a remaining projectile located in the tricep region of his left arm. He further testified that the gunshots suffered by Devonksi were "distance shots," which occur when there is "no stippling of the skin" and occur at a distance "greater than 2 feet."

¶37.    Markevious admitted he shot his uncle, who later died from his injuries. But even under his narrative, Markevious admitted that he blindly fired the gun twice toward his uncle. And in the aftermath of all the chaos, Devonski staggered into the doorway, uttering his final words: "Webo shot me."

¶38.    The jury was presented with at least two views of what happened that day. The State presented medical testimony that the victim was shot in the back from a distance. The

11

defendant took the stand and claimed self-defense. "When evidence or testimony conflicts, the jury is the sole judge of the weight and worth of evidence and witness credibility." *Campbell v. State*, 380 So. 3d 985, 990 (¶10) (Miss. Ct. App. 2024) (quoting *Wayne v. State*, 337 So. 3d 704, 714 (¶39) (Miss. Ct. App. 2022)).

¶39. The dissent contends this appeal presents a rare situation that requires reversal because the verdict was contrary to the overwhelming weight of the evidence. While we may reverse a judgment contrary to the overwhelming weight of the evidence, we may only do so if allowing the verdict to stand would sanction an unconscionable result. *Jordan*, 413 So. 3d at 616 (¶26). However, this Court is "not permitted to sit as the 'thirteenth juror' and 'assume[] the role of juror on appeal.'" *Green v. State*, 312 So. 3d 1214, 1218 (¶18) (Miss. Ct. App. 2021) (quoting *Little*, 233 So. 3d at 289 (¶1)). The jury heard the same arguments made by the dissenting opinion, but the jury also heard evidence that opinion does not highlight. For instance, the medical examiner, Dr. Peretti, concluded that Devonski's manner of death was homicide. Indeed, the victim was shot in the back from a distance that the doctor believed was greater than two feet. And while the dissenting opinion characterizes Devonski as the "aggressor," the jury could have reasonably concluded that due to the wound in his back and the distance between him and the shooter, he was actually the victim. The jury also heard uncontested testimony that Devonski's last words to his family were, "Webo shot me."

¶40. The jury sat through the trial and heard Markevious and other witnesses testify. To the

extent any evidence or testimony conflicted, jurors were empowered to accept or reject the utterances of any witness." *Duckworth v. State*, 767, So. 2d 296, 299 (¶6) (Miss. Ct. App. 2000).

¶41. Therefore we find the verdict was not against the overwhelming weight of the evidence.

## CONCLUSION

¶42. For the reasons stated above, we affirm Markevious' conviction and sentence.

¶43. **AFFIRMED.**

**BARNES, C.J., LAWRENCE, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.; CARLTON, P.J., JOINS IN PART.**

**WESTBROOKS, J., DISSENTING:**

¶44. I respectfully dissent. I would hold that this is one of the rare occasions in which reversal of a criminal conviction is warranted because the verdict was contrary to the overwhelming weight of the evidence. The victim, Devonski Banks, was the thirty-six-year-old, three-hundred-pound, six-foot-two-inch-tall uncle of the fifteen-year-old defendant, Markevious Banks. Despite the availability of multiple witnesses who were outside the family home at the time of the shooting, the State chose only to put on witnesses who remained inside the home and who did not witness the interaction between the victim and defendant in the moments leading to the shooting.

13

¶45.   Elizabeth Banks Moore and Teretha Banks testified under subpoena for the State. Elizabeth is Markevious' great-aunt and rented the trailer where the extended family was gathered the night of the shooting. While putting a grandchild to bed, Elizabeth heard a "commotion" involving her sister Teretha, her other sister Helen, and Helen's children Lashonda and Devonski. Markevious is Lashonda's son. Elizabeth asked Lashonda to leave in order to defuse the situation. When the argument did not de-escalate, Elizabeth called 911. Lashonda and her mother, Helen, went outside. Markevious, who at some point had been inside the house participating in the argument, was outside the house by the time Elizabeth asked Lashonda to leave, and Elizabeth did not see him. Initially, Devonski remained inside with Elizabeth and Teretha. However, Devonski changed his mind and went outside against Elizabeth's request. Elizabeth did not see Devonski with a gun that evening. Elizabeth testified that it stayed dark outside her home at night because her outside light was out. After Devonski went outside, she heard a gunshot, and "after that gunshot, I heard two or three more shots, and that's when Devonski ran in the house . . . and he collapsed there."

¶46.   Teretha testified that on the evening of the shooting, Markevious was in a heated discussion with his grandmother Helen about money when Devonski interjected himself into the argument, objecting to how Markevious was speaking to Helen. According to Teretha, Markevious pulled a tan gun from his backpack and racked it, but he did not point it at anyone. Lashonda and Helen managed to get Markevious to go outside, while Devonski stayed inside. However, Devonski eventually went outside in pursuit of Markevious. Teretha

14

remained inside. She heard gunshots, and Devonski re-entered the house saying, "Webo [(Markevious)] shot me," before collapsing. She did not see Devonski with a gun.

¶47.    The State did not call any other witnesses who were present at the residence on the evening of the shooting. The defense called Lashondra (Markevious' mother), Booker Reese (Lashondra's husband), Helen (the victim's mother and the defendant's grandmother), and the defendant, Markevious. All these witnesses were outside the residence at the time the shooting occurred.

¶48.    Lashondra testified that after she, Helen, and Markevious went outside, she was waiting by her car with her other three minor children for her husband, Booker, to return from a neighboring home so that they could leave. Devonski then came outside yelling, and according to Lashondra, "that's when he got the gun out of his truck, and he had it in the air, and he went to shooting. And he ran down the street. And then that's when he grabbed Markevious around his neck and went to dragging him back down the road, with the gun to his head." From where Lashondra was standing near her car holding her infant, her view was blocked from the location Markevious and Devonski had gone down the road. She ran behind the car and called 911 to "tell[] them what Devonski was doing to Markevious." She testified that Devonski's gun was black, and she denied that Markevious had displayed a tan gun inside that night.

¶49.    Booker Reese testified that he heard a commotion and yelling, so he walked back from a neighbor's home where he had been visiting. He testified that "when I come from around

15

the corner, I walked up on Devonski had Markevious around the neck with a gun to his head." Reese then ran to Lashondra's car and hid behind it, and he did not witness the moment of the shooting. Booker also testified that Devonski fired shots in the air with a black gun that Reese had seen Booker have earlier that day.

¶50. Helen Banks testified. Helen testified that she and Markevious had been having a conversation about a car and that Devonski intervened because he thought they were arguing. When the conversation escalated, Helen, Markevious, and Lashondra went outside at the request of Elizabeth. After some time, Devonski came outside and went to his truck. He got a gun, began yelling, and grabbed Markevious. Helen testified that Devonski had Markevious around the neck and dragged him down the road. She testified that she began running away when Devonski began shooting because she had been shot before and did not want to be shot again.

¶51. Markevious testified in his own defense. On the evening of the shooting, Markevious was explaining to his grandmother Helen that he wanted to sell his car to buy a faster one, when the argument with Devonski and the other family members escalated. After he, his mother, and his grandmother went outside, he thought that about ten minutes passed before Devonski came outside. At that point, Markevious testified, "I thought everything was straight. He went outside in the truck. When I looked back over, he was coming towards me. My grandma had to tell him like, '[W]hat are you doing?' He got to shooting the gun in the air. He walked up to me and grabbed me around my neck and started choking me . . . . He

16

was dragging me down the street." According to Markevious, when Devonski put the gun to Markevious' head, "I started reaching for the gun. When I got a hold to it, you know, I snagged the gun and fired the gun two times to get him off of me." When asked if he had aimed where he was firing on purpose, Markevious responded, "No, sir. I just shot the gun to get him off of me." He ran from the scene and threw the gun. When pressed on cross-examination, he reiterated, "I don't know where I was pointing the gun. I just shot the gun . . . . I don't know where I was shooting the gun. I just shot the gun to get him off of me. When I got the gun in my hand, I just shot the gun to get him off of me." Markevious also testified that he was with Devonski when Devonski purchased a black gun two days before "on the street," and Markevious said that they had practiced shooting it in the country after Devonski bought ammunition at a pawn shop. Markevious denied having a tan gun inside the home.

¶52.   Every testifying witness who saw the victim and defendant in the moments before the shooting testified that Devonski was yelling, that he fired shots in the air, that he had Markevious in a headlock, that he held a gun to Markevious' head, and that he was dragging Markevious down the road. The witnesses inside the house testified that Devonski chose to leave the house against their wishes in order to continue the confrontation with his nephew. A total of four shell casings were recovered. Markevious maintained on direct and cross-examination that he only fired two shots. Devonski was shot twice, once in the lower back at an upward angle, and once in the arm. Because Devonski immediately received intensive

medical care and did not die for another week, his skin was never tested for gunshot residue. The record does not reflect what clothing he was wearing, whether the clothing was tested, or whether the clothing was of a nature that could impede the formation of stippling from a close gunshot wound on his skin. The State's expert, when asked whether the shots were close-range or distance-range shots, stated, "I think it's *inconclusive* in a way" and that "it's *probably* more of a distance shot[.]" (Emphasis added).

¶53.    Even viewing the evidence in the light most favorable to the verdict, I would find that Markevious' manslaughter conviction should not stand, particularly in light of the inconclusive expert opinion on the distance of the shot and the uncontested testimony of the witnesses who saw Markevious and Devonski in the moments before the shooting. *See Prather v. State*, 379 So. 3d 343, 351 (¶29) (Miss. Ct. App. 2023) (reviewing challenge to weight of the evidence and viewing the evidence "in the light most favorable to the verdict"). "To discern that the jury verdict is against the [overwhelming] weight of the evidence, we must 'accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial.'" *Smith v. State*, 821 So. 2d 908, 910 (¶3) (Miss. Ct. App. 2002) (quoting *Smith v. State*, 800 So. 2d 535 (¶4) (Miss. Ct. App. 2001)). To "mandate" a new trial, the verdict must be "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction 'unconscionable injustice.'" *Id.* Although "the standard of review in such cases is high, '[our] supreme court] has not hesitated to invoke its authority to order a new trial and allow a

18

second jury to pass on the evidence where it considers the first jury's determination of guilt to be based on extremely weak or tenuous evidence even where that evidence is sufficient to withstand a motion for a directed verdict.'" *Dilworth v. State*, 909 So. 2d 731, 737 (¶22) (Miss. 2005) (quoting *Lambert v. State*, 462 So. 2d 308, 322 (Miss. 1984) (Lee, J., dissenting)); *see also Lindsey v. State*, 212 So. 3d 44, 45 (¶4) (Miss. 2017). While appellate courts do not sit as a "thirteenth juror" we nevertheless do have the authority to reverse a verdict when it is contrary to the overwhelming weight of the evidence. *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017).

¶54.    Devonski's status as the aggressor in pursuing the confrontation with Markevious outside is particularly significant. *See Johnson v. State*, 52 So. 3d 384, 391 (¶18) (Miss. Ct. App. 2009). In *Johnson*, this Court reversed a murder conviction, finding that the verdict was against the overwhelming weight of the evidence. *Id.* at 387 (¶1). The eyewitness testimony supported that the victim had become "physically aggressive" toward Johnson. *Id.* at 388 (¶6). Johnson had been trying to avoid the victim and was trying to drive his car away when the victim threateningly came up to the window in what Johnson thought was an attempt to attack him with a broken beer bottle. *Id.* at 389 (¶9). Our analysis emphasized that "[i]t is to be remembered that all of the eyewitnesses testified that Johnson did not seek out [the victim]." *Id.* at 391 (¶18). Further, "all of the eyewitnesses presented by the defense and the State indicated that Johnson was attempting to drive away." *Id.*

¶55.    Markevious never contested that he shot Devonski.  Markevious was the only witness

19

to the shooting. The State chose to put on sparse evidence of the context of the shooting despite the availability of witnesses who saw Markevious and Devonski in the mere moments before the shooting happened. I would find that Banks persuasively argues on appeal that "not only did the overwhelming weight of the evidence favor Markevious, but the State's evidence was inconclusive, sparse, conjectural, and required the extensive use of imagination to produce a guilty verdict." The weakness of the State's case is evidenced by the grand jury's refusal to indict Markevious for murder. Further, the circumstances of the shooting can be distinguished from cases in which a defendant arguing self-defense has lost a weight-of-the evidence argument on appeal.

¶56.   For example, in *Williams v. State*, 391 So. 3d 1151, 1158 (¶35) (Miss. 2024), a defendant argued on appeal that the jury's verdict was against the overwhelming weight of the evidence because the evidence established that he acted in necessary self-defense. However, the Supreme Court affirmed the conviction because the evidence showed that the victim had not yet reached the defendant's vehicle when he fired shots, there had not been any physical altercation in the moments before the shooting, and only the defendant claimed that the victim was armed. *Id.* at (¶¶33-39). Here, by stark contrast, the uncontested evidence from those witnessing the altercation in the moments before the shooting was that the victim came out of the house yelling at the defendant, seeking him out, putting him in a headlock, holding a gun to his head, and dragging him down the street. Additionally, and unlike in *Williams*, three witnesses in addition to the defendant testified that the victim had a gun.

20

¶57. Because I would reverse and remand for a new trial, I dissent.

**McDONALD, J., JOINS THIS OPINION. CARLTON, P.J., JOINS THIS OPINION IN PART.**